**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

KIOSK INFORMATION SYSTEMS, INC.,

        Plaintiff,

   vs.

COLE KEPRO INTERNATIONAL, LLC; AMERICAN KIOSKS;
ERIC NEBOLA; TAYLOR LIGHTSEY; and MICHAEL RASMUSSEN,

        Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff KIOSK Information Systems, Inc. ("KIOSK" or "Plaintiff") hereby files its Complaint against Defendants Cole Kepro International, LLC ("Cole Kepro"), American Kiosks, Eric Nebola ("Nebola"), Taylor "Tucker" Judson Lightsey ("Lightsey"), and Michael Rasmussen ("Rasmussen") (collectively, "Defendants"), and, in support thereof, alleges as follows:

### NATURE OF THE CASE

1.     This is a blatant case of breach of contract and theft of KIOSK's trade secrets and other confidential and proprietary information by KIOSK's former employees, Nebola, Lightsey, and Rasmussen.

2.     At the direction of Cole Kepro and its subsidiary American Kiosks, Nebola, Lightsey, and Rasmussen conspired as part of a deceptive scheme to steal KIOSK's trade secrets and confidential and proprietary information in order to launch and gain an unfair business

advantage for American Kiosks—now a direct competitor of KIOSK in the fiercely competitive marketplace for digital kiosks.

3.      Founded in 2003 and based in Colorado, KIOSK (https://kiosk.com/) has led the industry in the design and manufacture of self-service solutions, including self-service kiosk machines.  Until mid-October 2021, Nebola served as KIOSK's Vice Present of Sales and Lightsey served as KIOSK's Director of Product Management.  Until June 2, 2022, Rasmussen served as KIOSK's Prototype Systems Manager.

4.      Nebola, Lightsey, and Rasmussen all acknowledged that they held executive roles at KIOSK, having access to KIOSK's confidential, proprietary, and trade secret information.  As such, they all agreed to be bound by KIOSK's Executive Confidentiality Assignment Agreement on March 3, 2021.

5.      However, on information and belief, on August 25, 2021, during a KIOSK-funded business trip to Las Vegas to meet with a KIOSK customer, Nebola secretly met with executives from Cole Kepro to discuss forming a competing company, which would later be named American Kiosks.

6.      In less than two months and with Cole Kepro's support, Nebola and Lightsey indeed left KIOSK and formed American Kiosks in an office building minutes (less than 5 miles) from KIOSK's office—Nebola as President and Lightsey as Vice President.  On information and belief, they immediately began targeting and reaching out to KIOSK's existing and potential customers—knowing what those customers wanted and expected in products and pricing from their years of working at KIOSK—and promised these same customers nearly identical product offerings at lower prices using the American Kiosks brand.

4866-0582-3310

7.      After Nebola and Lightsey's departure from KIOSK, KIOSK warned Nebola, Lightsey, and Cole Kepro's / American Kiosks' attorneys of their continuing obligations to KIOSK.  However, these warnings were largely ignored.  On information and belief, Nebola and Lightsey continued to use KIOSK's trade secrets and confidential and proprietary information to direct KIOSK's existing and potential customers away from KIOSK and towards American Kiosks.  Additionally, on information and belief, Nebola and Lightsey solicited Rasmussen to join American Kiosks, in direct violation of their agreements with KIOSK.

8.      On information and belief, by at least May 2022, Nebola and Lightsey poached Rasmussen, KIOSK's Prototype Systems Manager, to join American Kiosks as their Product Operations Manager.  Cole Kepro / American Kiosks, Nebola, and Lightsey were all well-aware of the KIOSK trade secrets and confidential and proprietary information Rasmussen had— especially regarding KIOSK's prototypes for KIOSK's more recent customers.

9.      On or about August 17, 2022, KIOSK—through its attorneys—expressed its concern to Cole Kepro / American Kiosks regarding Nebola, Lightsey, and Rasmussen's taking of KIOSK's trade secrets and confidential and proprietary information.

10.     KIOSK has since discovered that American Kiosks has indeed incorporated KIOSK's trade secrets and confidential and proprietary information in American Kiosks' products, including for a KIOSK customer, Bitcoin of America ("BOA").  While still employed at KIOSK, both Nebola and Lightsey helped design a prototype for BOA.  Lightsey was actively involved in the component selection working with KIOSK's suppliers, detailed costing analysis, and margin models for the proposed kiosk for BOA.  Nebola worked closely with pricing and gained invaluable knowledge of the component prices and costs associated with the prototype for BOA.

11.     KIOSK has suffered, is suffering, and will continue to suffer substantial and irreparable harm from the theft and misuse of its confidential, proprietary, and trade secret information.   Defendants' wrongful acts constitute, among other things, breach of contract, misappropriation of trade secrets, interference with prospective business advantage, unfair competition, and unjust enrichment.   In so doing, Defendants have caused KIOSK considerable damage.

## THE PARTIES

12.     Plaintiff KIOSK Information Systems, Inc. is a Colorado corporation with its principal place of business located at 346 South Arthur Avenue, Louisville, Colorado 80027.

13.     Defendant Cole Kepro International, LLC is a Nevada limited liability company, with its principal place of business located at 4170 Distribution Circle, North Las Vegas, Nevada 89030.

14.     Defendant American Kiosks is a Colorado based entity with its principal place of business located at 10901 W 120th Ave Ste 130, Broomfield, Colorado 80021.   On information and belief, American Kiosks is a subsidiary of Cole Kepro (*see* https://americankiosks.com/contact-us/ (last accessed January 13, 2023 at 9:18am.))   On information and belief, American Kiosks is the registered trade name used by Cole Kepro in the business of designing, developing, and selling kiosks in the State of Colorado.   On information and belief, American Kiosks is and at all times herein mentioned was the alter ego of Cole Kepro, and there exists, and all times herein mentioned has existed, a unity of interest and ownership between Cole Kepro and American Kiosks such that any separateness between them ceased to exist, in that Cole Kepro completely controlled, dominated, managed, and operated American

4866-0582-3310

Kiosks.  The terms "Cole Kepro" and "American Kiosks" therefore mean the same and are used interchangeable herein.

15.     Defendant Eric Nebola is an individual who is domiciled in Colorado and is the President of American Kiosks.  On information and belief, Nebola currently resides at 13034 Magnolia Street, Thornton, Colorado 80602 and works and has an office at American Kiosks in Broomfield, Colorado.

16.     Defendant Taylor "Tucker" Judson Lightsey is an individual who is domiciled in Colorado and is Vice President of American Kiosks.  On information and belief, Lightsey currently resides at 11929 Mountview Lane, Broomfield, Colorado 80021 and also works and has an office at American Kiosks in Broomfield, Colorado.

17.     Defendant Michael Rasmussen is an individual who is domiciled in Colorado and, on information and belief, currently resides at 603 Eaton Circle, Superior, CO 80027 and works and has an office at American Kiosks in Broomfield, Colorado.

## JURISDICTION AND VENUE

18.     The contracts between KIOSK and Nebola, Lightsey, and Rasmussen, respectively, that give rise to this action were executed and performed, at least in part, at KIOSK's offices in Louisville, Colorado.  This Court has personal jurisdiction over each of the Defendants because the acts alleged occurred, in whole or in part, within this District.  Moreover, Defendants have committed tortious acts within the District and have committed tortious acts that have caused injury to KIOSK within the District.  This Court also has personal jurisdiction over Defendants Nebola, Lightsey, and Rasmussen because they are residents of this District.

4866-0582-3310

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action alleges a claim arising under the laws of the United States.  This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to pursuant to 28 U.S.C. § 1367.

20.     Venue in this Court is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because contracts which give rise to this dispute were to be performed in this District, and a substantial part of the events giving rise to the claims asserted herein occurred in this District.

**FACTS RELEVANT TO ALL CLAIMS**

**A.      KIOSK's Business and Proprietary Information**

21.     KIOSK designs, manufactures, develops software, and provides support for standard and customized self-service kiosk machines.  In the nearly three decades that it has been involved in the kiosk business, KIOSK has deployed more than 250,000 kiosk units to businesses in a variety of industries, including finance and cryptocurrency, gaming, government, healthcare, hospitality, retail, storage, transportation, and tourism across a variety of applications and use cases.  KIOSK has become one of the leading providers of self-service kiosk machines in the United States.

22.     KIOSK's offerings are all-inclusive, enabling KIOSK to control project quality and timing from design through manufacturing through deployment to the customer and ongoing service.  KIOSK has an experienced in-house team of employees with niche expertise in a variety of key disciplines, as well as specialized design and mechanical engineering personnel.

23.     One of KIOSK's key competitive advantages in the industry is its substantial investment in the training and development of its personnel and developing new technology and business processes so that it can provide state-of-the-art services and products to its customers.

KIOSK's most valuable resources are its employees and intellectual property, including KIOSK's trade secrets that it carefully developed over the course of nearly 30 years.

24.     For nearly 30 years, KIOSK has developed certain trade secrets as part of its kiosk business, including but not limited to its customer list and business and technical information for each customer, including contact information, pricing and historical purchasing information, training information, and customers' customized solutions created based on their specific business and technical needs and preferences.  KIOSK has expended and invested a substantial amount of time, energy, and money compiling this valuable information.  These trade secrets give KIOSK a competitive edge in the ever competitive kiosk industry.

25.     KIOSK has, at all times mentioned herein, employed reasonable efforts to protect its trade secrets and other proprietary and confidential information with respect to its business, employees, customers, products, and services, including technical and pricing information regarding its products and market intelligence.

26.     KIOSK takes a number of steps to protect its confidential, proprietary, and trade secret information.  KIOSK has implemented internal polices applicable to all employees that protect KIOSK's confidential, proprietary, and trade secret information.

a.     As a general practice, KIOSK's employment contracts contain provisions that ensure KIOSK owns all work product and developments created by its employees and that those employees are required to maintain, both during and after the term of employment, the confidentiality of all such information.

b.     All KIOSK employees are required to review KIOSK's employee policies— including its policy of confidentiality, which are widely accessible to all employees

4866-0582-3310

on KIOSK's employee intranet, SharePoint.  KIOSK's employee intranet also sets forth polices on avoiding conflicts of interest with competitors.

c.      KIOSK further protects its confidential and proprietary information by utilizing security cameras and limiting entry to KIOSK's buildings only to those with keycards.  KIOSK provides no public entry to its buildings.

d.      KIOSK also individually assigns unique IDs and passwords to each employee for access to KIOSK's servers and limits access to files based on the specific security clearance of each employee.

e.      KIOSK conducts exit interviews with each departing employee, during which it reminds the employee of their confidentiality obligations and the employee returns their building access keys, among other things.  Afterwards, KIOSK immediately terminates the employee's access to KIOSK's servers.

f.      KIOSK also attempts to enter into agreements or acknowledgements with departing employees that remind them of their continuing obligations to KIOSK regarding the protection of KIOSK's proprietary and confidential information.

27.      KIOSK also requires its employees to sign confidentiality and non-solicitation agreements.  The confidentiality provisions preclude KIOSK employees from using or disclosing confidential information related to its business.   These agreements also preclude KIOSK employees from "directly or indirectly" soliciting their coworkers for employment somewhere else.  KIOSK also requires its employees to read a Business Ethics Code of Conduct Policy.  This Policy explicitly states that confidential information must be "carefully controlled and protected." Further, the majority of KIOSK's marketing, pricing, and training and development material is

labeled "confidential" and/or "for internal use only."  KIOSK also includes confidentiality clauses in its contracts with its customers and distributors.

28.    Likewise, KIOSK has a practice of executing non-disclosure agreements with potential vendors and customers before sharing any proprietary or confidential information, and a practice of including confidentiality and non-disclosure provisions on its supplier and other agreements with vendors and customers.

**B.    KIOSK's Sales and Product Team**

29.    For nearly 30 years, KIOSK carefully built a team of employees from the ground up to design, manufacture, and sell self-service solutions, including self-service kiosk machines. Some key members of KIOSK's sales and products team are identified herein.

30.    Nebola was employed by KIOSK for over 18 years, from approximately April 2003 through approximately October 2021.  Nebola's initial role at KIOSK was a Mechanical Engineer; but through the opportunities provided at KIOSK, he rose through the ranks and became KIOSK's Vice President of Sales—the last position he held before joining competitor Cole Kepro / American Kiosks.

31.    In his position as Vice President of Sales, Nebola had access to KIOSK's confidential and proprietary information and trade secrets, including but not limited to confidential information about KIOSK's customer database, customer agreements, customers' historical purchasing preferences, customers' key contact information, pricing, quotes, customers' business and technical needs and preferences, customers' service history, as well as confidential, proprietary, and trade secret information regarding KIOSK's product designs, engineering files (*e.g.*, CAD files), sales prospects, product plans, future product development initiatives, actual and

9

planned product technical specifications, pricing and marketing strategy, cost/profit margins, bills of materials ("BOMs"), and component suppliers.  Moreover, Nebola's access to KIOSK's Salesforce database granted him unqualified opportunities to personally engage with more than 8,000 of KIOSK's customers on KIOSK's proprietary customer list.  Nebola was also tasked with the responsibility to maintain and develop relationships with hundreds of KIOSK customers on behalf of KIOSK.

32.     Lightsey was employed by KIOSK for nearly 14 years, from approximately November 2007 through approximately October 2021.  His first role was an Engineering Intern; but similar to Nebola, through KIOSK's unwavering support of its employees, Lightsey climbed the ladder and eventually became Director of Product Management—his last position at KIOSK before joining competitor Cole Kepro / American Kiosks.

33.     In his position as Director of Project Management, Lightsey developed and had access to KIOSK's confidential and proprietary information, including, but not limited to, product plans, future product development initiatives, actual and planned product technical specifications, product designs, engineering files (*e.g.*, CAD files), bills of materials ("BOMs"), and component suppliers.  Moreover, Lightsey's credentials gave him access to KIOSK's databases, which contain the contact and other vital information regarding over 8,000 KIOSK customers on KIOSK's proprietary customer list.  Lightsey was also tasked with the responsibility to maintain and develop relationships with hundreds of KIOSK customers on behalf of KIOSK.

34.     Rasmussen was employed by KIOSK for nearly twenty-four years, from approximately July of 1998 through approximately June of 2022, with a break in employment from

approximately February through December of 2015. Most recently, and at the time his employment at KIOSK ended, Rasmussen was KIOSK's Prototype Systems Manager.

35.     In his position as Prototype Systems Manager, Rasmussen had access to KIOSK's confidential and proprietary information, including, but not limited, to engineering specifications for custom products, product configuration, and new prototype information. As a key team member, Rasmussen was constantly involved in prototype designs for numerous KIOSK customers, a role which also gave him direct access to hundreds of KIOSK customers.

**C.     Nebola, Lightsey, and Rasmussen's Agreements with KIOSK.**

36.     In connection with their employment at KIOSK as executives (having a manager level or above) and in addition to existing agreements with KIOSK, Nebola, Lightsey, and Rasmussen were each required to enter into Executive Confidentiality Assignment Agreements with KIOSK—all dated February 22, 2021 (the "Confidentiality Agreements").

37.     The Executed Confidentiality Agreements are attached hereto as **Exhibits 1, 2, and 3**, respectively. The obligations of the Confidentiality Agreements expressly survive termination of employment.

38.     The Confidentiality Agreement states that:

> It is desirable and in the best interests of the Company to protect confidential, proprietary and trade secret information, to prevent unfair competition by former employees of the Company following separation of their employment with the Company, and to secure cooperation from former employees with respect to matters related to their employment with the Company.

> Executive acknowledges that Executive's employment or continued employment with the Company depends on, among other things Executive's willingness to agree to and abide by the non-disclosure and other covenants contained in this Agreement.

4866-0582-3310

39.     The Confidentiality Agreement further includes Non-Solicitation Covenants, stating that:

>  **Non-Solicitation Covenants.**  Executive covenants and agrees that during a period of one (1) year Executive will not on behalf of Executive or directly or indirectly through another person or entity (including without limitation as a proprietor, owner, principal, agent, partner, officer, director, employee manager, member, consultant or otherwise):
>
>  Solicit, divert, take away, or otherwise attempt in any manner to solicit, divert, or take away, the business of any customer, supplier or other business relation of the Company or any of its Affiliates, that Executive knows, or reasonably should know, is a customer, supplier or other business relation of the Company, for a purpose that is related to a Restricted Business, or in any way interfere with the relationship between any such customer, supplier or other business relation and the Company or any of its Affiliates (including, without limitation, inducing such person or entity to cease doing business with the Company or any of its Affiliates or making any negative statements or communications about the Company or any of its Affiliates); or:
>
>  Solicit or induce to leave the Company any person who Executive knows, or reasonably should know, is then an employee, consultant, or contractor of the Company or any of its Affiliates or who was an employee, consultant or contractor of the Company or any of its Affiliates (with respect to the Company's or any of its Affiliate's business) at any time during the twelve-month period immediately preceding termination of Executive's employment with the Company.  …

40.     The Confidentiality Agreement further includes a Use of Confidential Information section, stating that:

>  **Executives Use of Confidential Information**.  Executive will at all times during and after employment with the Company maintain the confidentiality of the Confidential Information.  Executive will not, without Company's prior written consent, direct or indirectly: (1) copy or use any Confidential Information; or (2) show, give, sell disclose or otherwise communicate any Confidential Information to any person or entity other than the Company.  …

**D.      Nebola's Solicitation of Lightsey and Their Diversion of KIOSK's Prospective Business Relationships**

41.      On information and belief, on August 12, 2021, Troy Owens, a talent acquisition and search consultant, contacted Nebola concerning a prospective employment opportunity with American Kiosks, a subsidiary of Cole Kepro, which Owens described as "a fast-growing new business in the kiosk space" that was looking to find a "leader and key hires" to build out its sales organization.

42.      On information and belief, on August 13, 2021, Nebola responded to Owens that he was interested in learning more about the opportunity.

43.      On information and belief, over the weeks that followed, Nebola engaged in a scheme in which he made it appear as though he was acting on behalf of KIOSK and in KIOSK's best interest, when Nebola's true motive was to actually poach KIOSK's employees and divert business away from KIOSK to his soon-to-be employer.

44.      On or about August 20 through August 23, 2021, through further email exchanges with Owens, Nebola arranged to meet with Andrew Cashin, Cole Kepro's President and CFO, while Nebola was already scheduled to be in Las Vegas on behalf of KIOSK for a business meeting with one of KIOSK's customers scheduled for the morning of August 25, 2021.

45.      On August 25, 2021, on behalf of KIOSK, Nebola, Lightsey, and KIOSK's Director of Sales, Joe Sawicki, met with a KIOSK customer in Las Vegas.  Though the meeting was scheduled to begin at 11 a.m. Pacific Time, Nebola arrived late.  On information and belief, Nebola arrived late because he was meeting with Cashin and/or others at Cole Kepro.

46.      Nebola's trip to Las Vegas was on KIOSK's company time, and it was paid for entirely by KIOSK.

47. On information and belief, on September 29, 2021, Nebola again traveled to Las Vegas to meet and/or interview with Cole Kepro. Although he was in Las Vegas, Nebola falsely represented to KIOSK that he was in Estes Park, Colorado.

48. On October 4, 2021, Nebola attempted to send KIOSK's contracts with its client, CSG, to Lightsey via email. On information and belief, Nebola attempted to send these contracts for Cole Kepro's use and benefit; however, Lightsey was unable to access the attached contracts.

49. On October 5, 2021, Jared Muzzey, Account Executive for KIOSK, introduced Nebola to Sonny Meraban, CEO of BOA, in order to include Nebola in ongoing discussions concerning BOA's prospective purchase of 1000 kiosk units from KIOSK.

50. By the time Nebola was introduced to Meraban, BOA had already stated an intent to purchase 1000 kiosk units from KIOSK, and BOA and KIOSK were close to finalizing the terms of this proposed order. Among other things, Meraban had asked Muzzey: "Are we good on the order?" and whether the proposed payment plan was acceptable.

51. Upon Nebola's introduction to Meraban on Tuesday, October 5, 2021, Nebola set up a call with Meraban and others on the KIOSK account team to "finalize the terms" of the sale.

52. On the same day, Nebola sent Lightsey a KIOSK Sales Quote to BOA for 1000 units, and a KIOSK Sales Quote to BOA for 500 units. On information and belief, Nebola intentionally did not include the KIOSK account team on that correspondence. On information and belief, Nebola instead sent this information to Lightsey for Cole Kepro's and American Kiosks' use and benefit.

4866-0582-3310

53.     On October 6, 2021, Nebola and Lightsey traveled to Chicago, on behalf of KIOSK, to attend the National Association of Convenience Stores (NACS) Show.  Their trip to Chicago was on company time and was paid for entirely by KIOSK.

54.     Also, on October 6, 2021, KIOSK and BOA exchanged further correspondence aimed at finalizing BOA's order of KIOSK's units, including the negotiation of payment terms. During the course of those communications, BOA's CFO, Paul Bialobrzewski, proposed an order of 1000 units and a payment schedule for that order, and he proposed an alternative order of 500 units and a payment schedule for those units.

55.     On the evening of October 6, 2021, Nebola, Lightsey, and Muzzey met BOA's executive team for dinner in Chicago on behalf of KIOSK.

56.     On Thursday, October 7, 2021, Nebola and Lightsey returned home from Chicago—a day earlier than originally planned.

57.     Also, on October 7, 2021, Nebola emailed Samantha Miller, COO for BOA, his cell phone number and requested that she call him as soon as possible.  On information and belief, on the same day, Nebola and Lightsey advised Miller that they were leaving KIOSK to join a competitor, and that she should wait to place her kiosk order—that is, that BOA should refrain from proceeding with placing its order of 1000 kiosk units with KIOSK.

58.     On October 11, 2021, Nebola resigned from KIOSK.

59.     On October 16, 2021, Lightsey resigned from KIOSK.

60.     On November 11, 2021, Cole Kepro filed a Statement of Trade Name of a Reporting Entity with the Colorado Secretary of State, registering American Kiosks as the trade

4866-0582-3310

name under which Cole Kepro would be engaging in the business of designing, developing, and selling kiosks in the State of Colorado.

61.     On December 7, 2021, KIOSK President, Kim Kenney, and Sawicki traveled to Las Vegas to meet with Coin Cloud.  In that meeting, Coin Cloud's COO, James Bauer, informed them that Cole Kepro's President and CFO, Cashin, had requested a meeting to give Coin Cloud an important update.  Cashin then stated to Bauer that Cole Kepro had hired Nebola and Lightsey, KIOSK's two key players, and that KIOSK was "gutted" and no longer a viable kiosk supplier.

62.     On January 21, 2022, at the National Retail Federation (NRF) Conference & Expo in New York, New York, Coin Cloud's executives informed KIOSK that Cashin had again contacted them, and again stated that Coin Cloud should not be doing business with KIOSK.

63.     On February 9, 2022, at the ATM Industry Association (ATMIA) conference in Orlando, Florida, BOA's COO, Miller, told Sawicki and Muzzey of KIOSK about her October 7, 2021 exchange with Nebola and Lightsey—that, on October 7, 2021, Nebola and Lightsey advised Miller that they were leaving KIOSK to join a competitor and that BOA should refrain from proceeding with placing its order of 1000 kiosk units with KIOSK.

64.     Miller also informed Sawicki and Muzzey that BOA no longer intended to place an order for 1000 kiosks from KIOSK and would instead be dual sourcing a pilot order between KIOSK and Cole Kepro.

**E.     Defendants Continue to Raid KIOSK's Employees While Openly Competing and Targeting KIOSK Customers Using KIOSK's Trade Secrets**

65.     Cole Kepro, American Kiosks, Nebola, and Lightsey's pursuit of KIOSK's employees and customers did not stop there.  On February 9, 2022, at the ATMIA conference,

Cashin approached KIOSK employees at a lobby bar and told them that they would all be working for him soon.

66.     On May 18, 2022, Cole Kepro offered KIOSK employee Michael Rasmussen the position of Product Operations Manager.  On information and belief, Rasmussen was recruited by Nebola and Lightsey, in violation of their Executive Confidentiality Assignment Agreements.

67.     Upon leaving KIOSK, Rasmussen informed KIOSK that he was leaving to move to Arizona to start a new career with his sister—a career that consisted of home remodeling with no connection to kiosks.  In actuality, Rasmussen had already accepted Cole Kepro's job offer as American Kiosks' Product Operations Manager.

68.     In his position as Prototype Systems Manager at KIOSK, Rasmussen had access to confidential information and trade secrets, including, but not limited, to proprietary information regarding engineering specifications for custom products, product configuration, and component sourcing.

69.     On information and belief, Defendants used KIOSK's confidential and proprietary information and trade secrets to engage in a scheme to disrupt KIOSK's business relationships and divert KIOSK's customers from KIOSK and towards Cole Kepro and American Kiosks.  As an example, Defendants used KIOSK's confidential and proprietary information and trade secrets to design and develop a competing, and substantially similar kiosk for BOA.  The Cole Kepro / American Kiosks BOA design incorporates nearly all of the components KIOSK quoted to BOA. A comparison showing the similarities between the KIOSK BOA proposed design and the Cole Kepro / American Kiosks design that was actually sold by BOA is shown below.

4866-0582-3310



**KIOSK Design**                    **American Kiosk Design**

70.     This side-by-side comparison of the kiosk that KIOSK designed for BOA and the kiosk that was actually sold by Cole Kepro / American Kiosks highlights the following key similarities that, on information and belief, the following components used in both kiosks are sourced from the same suppliers: identical 21.5' PCAP monitors; barcode scanners strategically placed in similar areas on the kiosk; Cryptera EPP pin pads both placed directly below the barcode scanners; the insert credit card readers both placed on the right side of the pin pad; 80mm thermal printers; and check scanners and bill acceptors placed next to each other.

71.    In addition to its blatant copying of KIOSKS designs, Cole Kepro / American Kiosks copied entire sections of KIOSK's website and reproduced them on its website as shown below.

**KIOSK's Website:**

## Custom Design Overview

With over 28 years dedicated to customized design and integration, KIOSK has earned the reputation as The World's Leader in Custom Design. We have an outstanding Engineering Team including Industrial Design, Mechanical Engineers, and Safety / Compliance Engineering, who have crafted highly custom platforms for Fortune 100 clients. To accommodate the complexity of these custom projects, we've steadily expanded Technical Teams to surround every key project aspect with parallel Development and Project Management experts, greatly simplifying and accelerating our customer's path to market.

(https://kiosk.com/custom-kiosks/ - last accessed 1/13/2023).

**American Kiosks' Website:**

# CUSTOM DESIGN SOLUTION

At American Kiosks, steep customization is an ongoing daily demand. To accommodate this high demand, we've steadily expanded Technical Teams to surround every key project aspect with parallel development experts, greatly simplifying and accelerating our customer's path to market.

(https://americankiosk.com - last accessed 1/13/2023).

4866-0582-3310

**KIOSK's Website:**

## Design Experience

For over 28 years, our capabilities have been exercised and proven across 17+ vertical markets, building an unparalleled experience base for our customers to tap into.

The unique appeal of working with KIOSK for kiosk designing is two-fold:

- ⊘ Agile and unrestrained solution design, completely eliminating "One Size Fits All" constraints.
- ⊘ "A-Game" Team Members orchestrating all project development tracks – with the unique benefit of being together under one roof.

Solution Teams Include:

- ⊘ Custom enclosure and software design
- ⊘ Expert integration and in-house manufacturing
- ⊘ Advanced Program Management over product life cycle
- ⊘ Remote Management and field support

([https://kiosk.com/custom-kiosks/](https://kiosk.com/custom-kiosks/) - last accessed 1/13/2023).

**American Kiosk's Website:**

# CUSTOM KIOSK

**Work with our expert team to incorporate your brand's look and feel and create results that add value to your bottom line.**

- ✔ Agile and unrestrained solution design
- ✔ Expert integration and manufacturing
- ✔ Remote Management and Field Services
- ✔ Advanced Program Management
- ✔ Top Talent Team Members orchestrating all project development

([https://americankiosk.com](https://americankiosk.com)/custom-kiosk/ - last accessed 1/13/2023).

20

72.     On information and belief, Defendants continue to disclose and use KIOSK's trade secrets to KIOSK's detriment and to Defendants' benefit.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (Against Nebola, Lightsey, and Rasmussen)

73.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

74.     Nebola, Lightsey, and Rasmussen each entered into the Confidentiality Agreement, pursuant to which they agreed, among other things, that: (1) for a period of one year following the termination of their employment, they would not "[s]olicit, divert, take away, or otherwise attempt in any manner to solicit, divert, or take away, the business of any customer, supplier or other business relation of" KIOSK that they "know[], or reasonably should know, is a customer, supplier or other business relation of" KIOSK; or (2) "[s]olicit or induce to leave the Company any person who Executive knows, or reasonably should know, is then an employee … of the Company … at any time during the twelve-month period immediately preceding termination of Executive's employment with the Company…."

75.     The Confidentiality Agreement, to which Nebola, Lightsey, and Rasmussen agreed, further stated that: "Executive will at all times during and after employment with the Company maintain the confidentiality of the Confidential Information."

76.     Nebola and Lightsey breached the Confidentiality Agreement by attempting to solicit, divert, and take away BOA's and Coin Cloud's business from KIOSK, and by soliciting, diverting, and taking away BOA's business from KIOSK.

4866-0582-3310

77.     Nebola further breached the Confidentiality Agreement by soliciting Lightsey to leave his employment with KIOSK.

78.     Nebola and Lightsey further breached the Confidentiality Agreement by soliciting Rasmussen to leave his employment with KIOSK.

79.     On information and belief, Nebola, Lightsey, and Rasmussen breached the Confidentiality Agreement by disclosing to Cole Kepro and American Kiosks confidential and proprietary information belonging to KIOSK.

80.     KIOSK performed its obligations under its Confidentiality Agreements with Nebola, Lightsey, and Rasmussen.

81.     As a direct and proximate result of Nebola, Lightsey, and Rasmussen's breach of their Confidentiality Agreements, KIOSK suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF
### Breach of the Duty of Good Faith and Fair Dealing
### (Against Nebola and Lightsey)

82.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

83.     The Confidentiality Agreement includes an implied covenant of good faith and fair dealing.

84.     By entering into the Confidentiality Agreement, Nebola and Lightsey agreed to act in a manner consistent with the agreed common purpose and with the reasonable expectations of the parties to that agreement.

85.     The Confidentiality Agreement provided Nebola and Lightsey considerable discretion with respect to their performance under the Confidentiality Agreement, including by

4866-0582-3310

entrusting Nebola and Lightsey with all aspects of their continued employment with KIOSK, allowing Nebola and Lightsey to control KIOSK's prospective customers' and customers' information and documents, engaging in negotiations and otherwise developing relationships with KIOSK's prospective customers and customers, and developing relationships with KIOSK's other employees.

86.     Nebola and Lightsey used the discretion conferred on them by the Confidentiality Agreement, and their associated continued employment, to act dishonestly, in a manner contrary to the agreed upon common purpose and the parties' reasonable expectations, and outside of accepted commercial practices to deprive KIOSK of the benefit of the Confidentiality Agreement, including by—while still employed at KIOSK—actively working to draw business and employees away from KIOSK for the benefit of Cole Kepro and American Kiosks.

87.     As a direct and proximate result of Nebola and Lightsey's breach of the duty of good faith and fair dealing, KIOSK suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**Intentional Interference with Contract**
**(Against Cole Kepro and American Kiosks)**

88.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

89.     The Confidentiality Agreement is a valid, binding, and enforceable contract between Nebola and KIOSK, between Lightsey and KIOSK, and between Rasmussen and KIOSK, respectively.

4866-0582-3310

90.     Pursuant to the Confidentiality Agreement, Nebola and Lightsey agreed to refrain from soliciting, diverting, or taking away, or attempting to solicit, divert, or take away, "the business of any customer, supplier or other business relation of" KIOSK.

91.     Pursuant to the Confidentiality Agreement, Nebola and Lightsey further agreed to refrain from soliciting KIOSK employees or inducing KIOSK employees to leave KIOSK.

92.     Cole Kepro and American Kiosks was or should have been aware of Nebola and Lightsey's Confidentiality Agreement, and their obligations thereunder.

93.     Cole Kepro and American Kiosks intentionally and improperly induced and/or otherwise caused Nebola and Lightsey not to perform, and to breach, their obligations under their respective Confidentiality Agreements.

94.     As a direct and proximate result of Cole Kepro and American Kiosks' intentional interference with the Confidentiality Agreements, and Nebola and Lightsey's performance thereunder, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**Tortious Interference with Prospective Business Advantage**
**(Against Nebola, Lightsey, Cole Kepro, and American Kiosks)**

95.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

96.     Through Nebola and Lightsey's employment with KIOSK, Nebola, Lightsey, Cole Kepro, and American Kiosks were aware of BOA's intent to purchase 1000 kiosk units from KIOSK.

97.     Nebola, Lightsey, Cole Kepro, and American Kiosks engaged in improper conduct with the intention to induce or cause BOA not to finalize its purchase of 1000 kiosk units from

KIOSK, and not to continue its business relations with KIOSK, including by informing Samantha Miller that Nebola and Lightsey were leaving KIOSK and advising that BOA should refrain from placing its order of 1000 kiosk units with KIOSK.

98.    Nebola, Lightsey, Cole Kepro, and American Kiosks actually induced or caused BOA not to enter into or continue its business relations with KIOSK.  Specifically, due to Nebola, Lightsey, Cole Kepro, and American Kiosks' intentional interference, BOA refrained from placing its order of 1000 kiosk units with KIOSK, as it originally proposed and planned, and instead chose to dual source a pilot order between KIOSK and Cole Kepro/American Kiosks.

99.    As a direct and proximate result of Nebola, Lightsey, Cole Kepro, and American Kiosks' intentional interference with KIOSK's business relations with BOA, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Defend Trade Secrets Act ("DTSA")**
**18 U.S.C. §1836, et seq.**
**(Against All Defendants)**

100.    KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

101.    As set forth above, KIOSK owns various valid trade secrets within the meaning of the DTSA, 18 U.S.C. §1839(3), which are critical to the success of its business.  Nebola, Lightsey, and Rasmussen had access to these trade secrets of KIOSK, including its engineering specifications for custom products, product configuration, confidential business and financial information, information concerning pricing and terms offered to its customers and prospective customers, and its negotiations with its customers and prospective customers, including BOA.

4866-0582-3310

102.    The trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

103.    KIOSK maintains these trade secrets on a secure system that is password-protected and restricted to authorized employees.

104.    In addition to storing its trade secrets in password-protected, secure networks, KIOSK has also sought to protect its trade secrets by limiting its employees' use of the information through Confidentiality Agreements and policies.

105.    KIOSK's trade secrets are not readily ascertainable or generally known, thus the trade secrets give KIOSK an economic advantage over KIOSK's competitors.

106.    The confidential trade secret information obtained by Defendants relates to KIOSK products and services used in interstate commerce.

107.    On information and belief, Defendants have acquired KIOSK's trade secrets by improper means.

108.    On information and belief, Nebola, Lightsey, and Rasmussen disclosed and/or used KIOSK's trade secrets without its consent, including by disclosing and/or using KIOSK's trade secrets for the benefit of Cole Kepro and American Kiosks.

109.    Nebola, Lightsey, Rasmussen, Cole Kepro, and American Kiosks knew, or should have known, that the trade secrets were acquired through improper means, including because Nebola, Lightsey, and Rasmussen shared information with Cole Kepro and American Kiosks in violation of their Confidentiality Agreements with KIOSK.

110.    The Defendants' actions as described herein constitute a misappropriation within the meaning of DTSA, 18 U.S.C. §1839(5).

4866-0582-3310

111.    On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit KIOSK's trade secrets.

112.    As a direct and proximate result of Nebola, Lightsey, Rasmussen, and Cole Kepro, and American Kiosks' misappropriation of KIOSK's trade secrets, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

113.    Because KIOSK's remedies at law are inadequate, KIOSK seeks injunctive relief. KIOSK is losing its competitive advantage and reputation, in an amount that may not be possible to determine.  Thus, Defendants must be restrained from use and disclosures of Defendants' trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(A).

### SIXTH CLAIM FOR RELIEF
**Trade Secret Misappropriation Under Colorado Uniform Trades Secrets Act**
**C.R.S. §7-74-101 *et seq.***
**(Against All Defendants)**

114.    KIOSK incorporates the foregoing paragraphs as if fully set forth herein. As set forth above, KIOSK owns various trade secrets within the meaning of "trade secrets" under Colorado law, which are critical to the success of its business.  Nebola, Lightsey, and Rasmussen possessed valid trade secrets of KIOSK, including its engineering specifications for custom products, product configuration, confidential business and financial information, information concerning pricing and terms offered to its customers and prospective customers, and its negotiations with its customers and prospective customers, including BOA.

115.    The trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

116. KIOSK maintains these trade secrets on a secure system that is password-protected and restricted to authorized employees.

117. In addition to storing its trade secrets in password-protected, secure networks, KIOSK has also sought to protect its trade secrets by limiting its employees' use of the information through Confidentiality Agreements and policies.

118. KIOSK's trade secrets are not readily ascertainable or generally known, thus the trade secrets give KIOSK an economic advantage over KIOSK's competitors.

119. On information and belief, Defendants have acquired KIOSK's trade secrets by improper means.

120. On information and belief, Nebola, Lightsey, and Rasmussen disclosed and/or used KIOSK's trade secrets without its consent, including by disclosing and/or using KIOSK's trade secrets for the benefit of Cole Kepro and American Kiosks.

121. Nebola, Lightsey, Rasmussen, Cole Kepro, and American Kiosks knew, or should have known, that the trade secrets were acquired through improper means, including because Nebola, Lightsey, and Rasmussen shared information with Cole Kepro and American Kiosks in violation of their Confidentiality Agreements with KIOSK.

122. On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit KIOSK's trade secrets.

123. As a direct and proximate result of Nebola, Lightsey, Rasmussen, Cole Kepro, and American Kiosks' misappropriation of KIOSK's trade secrets, KIOSK has suffered and continues

4866-0582-3310

to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

124.     Because KIOSK's remedies at law are inadequate, KIOSK seeks injunctive relief. KIOSK is losing its competitive advantage and reputation, in an amount that may not be possible to determine.  Thus, Defendants must be restrained from use and disclosures of Defendants' trade secrets pursuant to C.R.S. § 7-74-103.

**SEVENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against Nebola, Lightsey, Cole Kepro, and American Kiosks)**

125.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

126.     Defendants, through their misconduct, have obtained access to KIOSK's confidential business and financial information, and access to KIOSK's customers and potential customers, including BOA, at KIOSK's expense.

127.     Defendants are not entitled to KIOSK's confidential business and financial information, which they have acquired through misconduct.  Defendants should not be rewarded for their intentional wrongdoing.

128.     Nebola, Lightsey, Cole Kepro, and American Kiosks used KIOSK's confidential business and financial information, and its relationship with BOA, to misappropriate KIOSK's business opportunity with BOA including, specifically, BOA's prospective order for 1000 kiosk units.

129.     Nebola, Lightsey, Cole Kepro, and American Kiosks thus received a benefit, at KIOSK's expense, including by receiving BOA orders and/or other business that they would not have otherwise received, and associated compensation.

4866-0582-3310

**EIGHTH CLAIM FOR RELIEF**
**Common Law Unfair Competition**
**(Against All Defendants)**

130.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

131.     Defendants conspired to misappropriate KIOSK's trade secrets by using Nebola's position as KIOSK's Vice President of Sales, Lightsey's position as KIOSK's Director of Product Management, and Rasmussen's position as Prototype Systems Manager to gain access to KIOSK's confidential, proprietary, and trade secret information to divert KIOSK's customers and prospective customers to Cole Kepro and American Kiosks.

132.     Defendants have used and are continuing to use KIOSK's confidential, proprietary, and trade secrets information for their own benefit to gain an unfair advantage by poaching KIOSK's clients and prospective clients.

133.     For example, as previously mentioned, on information and belief Defendants used KIOSK's confidential, proprietary, and trade secret information to design for BOA a kiosk that was strikingly similar to that designed by KIOSK.   Specifically, Defendants incorporated components sourced from the same suppliers and strategically placed these components in a nearly identical configuration as that of the KIOSK design.

134.     Additionally, Defendants overtly copied entire sections of KIOSK's website for use in their own website.

135.     In so doing, Defendants gain an unfair advantage in the design, manufacture, and marketing of similar kiosks.

4866-0582-3310

136.     As a direct and proximate result of Defendants' actions, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### Breach of Duty of Loyalty
### (Against Nebola, Lightsey, and Rasmussen)

137.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

138.     Nebola, Lightsey, and Rasmussen were obligated to maintain KIOSK's confidential, proprietary, and trade secret information.

139.     As KIOSK executives and employees, Nebola, Lightsey, and Rasmussen owed KIOSK an undivided duty to act with the utmost good faith and candor and in KIOSK's best interest and to not compete with or divert business opportunities from KIOSK to its competition.

140.     KIOSK was entitled to place its trust and confidence in Nebola, Lightsey, and Rasmussen and to expect that they act with the utmost good faith and candor toward KIOSK in carrying out their duties at KIOSK.  As such, KIOSK authorized Nebola, Lightsey, and Rasmussen to access confidential, proprietary, and trade secret information to conduct business on KIOSK's behalf.

141.     Nebola sent Lightsey contracts with KIOSK's client, CSG, and quotes for the transaction with BOA, for the benefit of Cole Kepro and American Kiosks.  Nebola and Lightsey further acted against the best interests of KIOSK when they contacted BOA and instructed BOA to hold off placing an order for the kiosks with KIOSK because they were leaving KIOSK and joining a competitor.

31

142.     Nebola, Lightsey, and Rasmussen owed KIOSK a duty of loyalty as KIOSK's employees.

143.     Nebola, Lightsey, and Rasmussen breached their duty of loyalty to KIOSK by misappropriating KIOSK's confidential, proprietary, and trade secret information before resigning, and disclosing and/or using that information to benefit their new employer, Cole Kepro / American Kiosks.

144.     KIOSK has been damaged by Nebola's, Lightsey's, and Rasmussen's actions and is entitled to the relief requested. As a direct and proximate result of Nebola, Lightsey, and Rasmussen's actions, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**TENTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(Against Nebola and Lightsey)**

145.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

146.     Nebola and Lightsey were officers and/or directors of KIOSK and owed fiduciary duties to KIOSK.

147.     On information and belief, while employed by KIOSK, Nebola breached his fiduciary duties to KIOSK by agreeing to help Cole Kepro and American Kiosks poach KIOSK's employees.

148.     On information and belief, while employed by KIOSK, Nebola and Lightsey breached their fiduciary duties by using their insider knowledge of KIOSK's business, including proprietary information related to KIOSK's customers and prospective customers, to interfere with KIOSK's prospective business relationships.

4866-0582-3310

149.     As a result of these breaches, KIOSK has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff KIOSK requests that this Court enter judgment in its favor and for relief against Defendants, and each of them, as follows:

(a)     Entering a judgment that:

1.     Defendants Nebola, Lightsey, and Rasmussen have breached their Executive Confidentiality Agreements;

2.     Defendants Nebola and Lightsey have breached the Duty of Good Faith and Fair Dealing implicit in their Executive Confidentiality Agreements;

3.     Defendants Cole Kepro and American Kiosks intentionally interfered with the Executive Confidentiality Agreements between KIOSK and Nebola, Lightsey, and Rasmussen, respectively;

4.     Defendants Nebola, Lightsey, Cole Kepro and American Kiosks tortiously interfered with KIOSK's prospective business advantage with BOA and other customers;

5.     Each Defendant misappropriated KIOSK's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*;

6.     Each Defendant misappropriated KIOSK's trade secrets in violation of the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101, *et seq.*;

7.     Defendants Nebola, Lightsey, Cole Kepro, and American Kiosks were unjustly enriched;

4866-0582-3310

8.      Each Defendant has engaged in common law unfair competition;

9.      Defendants Nebola, Lightsey, and Rasmussen breached their duty of loyalty to KIOSK; and

10.     Defendants Nebola and Lightsey have breached their fiduciary duty to KIOSK.

(b)     Awarding KIOSK a permanent injunction to enjoin Defendants from engaging in the wrongful conduct described above;

(c)     Awarding KIOSK compensatory damages for the value of its loss of business and expectancies, its damaged business relationships, and its loss of reputation;

(d)     Awarding KIOSK the value of the unjust enrichment to Defendants arising from misappropriation of KIOSK's confidential, proprietary, and trade secret information, including, but not limited, to restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Defendants;

(e)     Awarding KIOSK punitive and exemplary damages for the intentional harm inflicted on KIOSK by Defendants;

(f)     Awarding KIOSK's pre-judgment and post-judgment interest;

(g)     Awarding KIOSK the value of its reasonable attorneys' fees and costs; and

(h)     Awarding KIOSK all such other and further relief as this Court deems just and adequate.

4866-0582-3310

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, KIOSK demands a jury trial on all issues so triable.

Dated:  February 7, 2023                           Respectfully submitted,

                                                          /s/ David J. Tsai
                                        David J. Tsai (*admitted*)
                                          Email:  david.tsai@pillsburylaw.com
                                        John Steger (*admitted*)
                                          Email:  john.steger@pillsburylaw.com
                                        Natalie Truong (*admitted*)
                                          Email:  natalie.truong@pillsburylaw.com
                                        **PILLSBURY WINTHROP SHAW PITTMAN LLP**
                                        Four Embarcadero Center, 22nd Floor
                                        San Francisco, CA  94111
                                        Telephone: (415) 983-1000

                                        *Attorneys for Plaintiff*
                                        *KIOSK INFORMATION SYSTEM, INC.*

KIOSK Information Systems, Inc.
346 South Arthur Avenue
Louisville, Colorado 80027

4866-0582-3310