**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-00352-GPG-KAS

KIOSK INFORMATION SYSTEMS, INC.,

                  Plaintiff,

    vs.

COLE KEPRO INTERNATIONAL, LLC;
AMERICAN KIOSKS; ERIC NEBOLA;
TAYLOR LIGHTSEY; and MICHAEL RASMUSSEN,

                  Defendants.

---

**DEFENDANTS COLE KEPRO INTERNATIONAL, LLC,
ERIC NEBOLA, TAYLOR LIGHTSEY, AND MICHAEL RASMUSSEN'S ANSWER**

---

Defendants Cole Kepro International, LLC d/b/a American Kiosks ("Cole Kepro"), Eric Nebola, Taylor Lightsey, and Michael Rasmussen (Messrs. Nebola, Lightsey, and Rasmussen collectively the "Employee Defendants"), by and through undersigned counsel, hereby provide their Answer to the Complaint [ECF No. 1] filed by Plaintiff KIOSK Information Systems, Inc. ("KIOSK" or "Plaintiff"). Unless otherwise stated, the answers below are for all Defendants. Where the Defendants' answers differ, each distinct answer is pleaded separately and attributed to a specific Defendant or Defendants.

## **GENERAL DENIAL**

Compass denies each and every matter set forth in Plaintiff's Complaint unless hereinafter specifically admitted or qualified.

## NATURE OF THE CASE

1.      This is a blatant case of breach of contract and theft of KIOSK's trade secrets and other confidential and proprietary information by KIOSK's former employees, Nebola, Lightsey, and Rasmussen.

**ANSWER: Denied.**

2.      At the direction of Cole Kepro and its subsidiary American Kiosks, Nebola, Lightsey, and Rasmussen conspired as part of a deceptive scheme to steal KIOSK's trade secrets and confidential and proprietary information in order to launch and gain an unfair business advantage for American Kiosks—now a direct competitor of KIOSK in the fiercely competitive marketplace for digital kiosks.

**ANSWER: Admitted that Cole Kepro manufactures and sells digital kiosks. Defendants deny all remaining allegations in Paragraph 2.**

3.      Founded in 2003 and based in Colorado, KIOSK (https://kiosk.com/) has led the industry in the design and manufacture of self-service solutions, including self-service kiosk machines. Until mid-October 2021, Nebola served as KIOSK's Vice Present of Sales and Lightsey served as KIOSK's Director of Product Management. Until June 2, 2022, Rasmussen served as KIOSK's Prototype Systems Manager.

**ANSWER: Admitted that until approximately October 11, 2021, Mr. Nebola was employed at KIOSK and that at the time of his departure from KIOSK, his title was Vice President of Sales. Admitted that until approximately October 16, 2021, Mr. Lightsey was employed at KIOSK and that at the time of his departure from KIOSK, his title was Director of Product Management. Admitted that until**

approximately May or June 2021, Mr. Rasmussen was employed at KIOSK and that at the time of his departure from KIOSK, his title was Director of Product Management. Defendants lack knowledge or information concerning the date KIOSK was founded and the current geographic scope of its operations, and on that basis, deny those allegations. Defendants deny the remaining allegations in Paragraph 3.

4.      Nebola, Lightsey, and Rasmussen all acknowledged that they held executive roles at KIOSK, having access to KIOSK's confidential, proprietary, and trade secret information. As such, they all agreed to be bound by KIOSK's Executive Confidentiality Assignment Agreement on March 3, 2021.

**ANSWER BY COLE KEPRO: Admitted that Messrs. Nebola, Lightsey, and Rasmussen each signed an agreement with KIOSK entitled Executive Confidentiality Assignment Agreement during their employment with KIOSK. Denied that all three Agreements are dated March 3, 2021. Cole Kepro lacks knowledge or information concerning the remaining allegations in Paragraph 4, and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that the Employee Defendants each signed an agreement with KIOSK entitled Executive Confidentiality Assignment Agreement during their employment with KIOSK. Denied that all three Agreements are dated March 3, 2021. Admitted that Mr. Nebola held an executive role at KIOSK. Denied that Mr. Lightsey or Mr. Rasmussen were executives at KIOSK. The Employee Defendants lack knowledge or information**

concerning what specifically KIOSK considered to be its "confidential, proprietary, and trade secret information" and on that basis deny those allegations. The Employee Defendants deny the remaining allegations in Paragraph 4.

5.      However, on information and belief, on August 25, 2021, during a KIOSK-funded business trip to Las Vegas to meet with a KIOSK customer, Nebola secretly met with executives from Cole Kepro to discuss forming a competing company, which would later be named American Kiosks.

**ANSWER BY COLE KEPRO AND NEBOLA: Admitted that on or about August 25, 2021, Mr. Nebola met with Cole Kepro in Las Vegas to discuss possible employment. Denied that American Kiosks is a separately constituted legal entity or that the parties discussed forming a separate entity during the meeting. Cole Kepro and Mr. Nebola deny the remaining allegations in Paragraph 5.**

**ANSWER BY LIGHTSEY AND RASMUSSEN: Messrs. Lightsey lack knowledge or information about the allegations in Paragraph 5 and on that basis, deny them.**

6.      In less than two months and with Cole Kepro's support, Nebola and Lightsey indeed left KIOSK and formed American Kiosks in an office building minutes (less than 5 miles) from KIOSK's office—Nebola as President and Lightsey as Vice President. On information and belief, they immediately began targeting and reaching out to KIOSK's existing and potential customers—knowing what those customers wanted and expected in products and pricing from their years of working at KIOSK—and promised these same

customers nearly identical product offerings at lower prices using the American Kiosks brand.

**ANSWER BY COLE KEPRO, NEBOLA, AND LIGHTSEY: Admitted that Mr. Nebola and Mr. Lightsey left KIOSK and joined Cole Kepro in October 2021. Admitted that Cole Kepro subsequently created a division within the company called "American Kiosks," but denied this is a separate legal entity, and denied that this was done in October 2021. Admitted that the American Kiosks office is located approximately 5 miles from KIOSK's office building. Denied that they immediately began targeting and reaching out to KIOSK's customers and denied that they offered KIOSK's customers nearly identical product offerings at lower prices. Defendants Cole Kepro, Nebola, and Lightsey deny the remaining allegations in Paragraph 6.**

**ANSWER BY RASMUSSEN: Admitted that Cole Kepro has created a division within the company called "American Kiosks" and that the American Kiosks office is located approximately 5 miles from KIOSK's office building. Mr. Rasmussen lacks knowledge or information about the remaining allegations in Paragraph 6 and on that basis, denies them.**

7.      After Nebola and Lightsey's departure from KIOSK, KIOSK warned Nebola, Lightsey, and Cole Kepro's / American Kiosks' attorneys of their continuing obligations to KIOSK. However, these warnings were largely ignored. On information and belief, Nebola and Lightsey continued to use KIOSK's trade secrets and confidential and proprietary information to direct KIOSK's existing and potential customers away from KIOSK and

towards American Kiosks. Additionally, on information and belief, Nebola and Lightsey solicited Rasmussen to join American Kiosks, in direct violation of their agreements with KIOSK.

**ANSWER BY COLE KEPRO: Denied that Cole Kepro has ever received or used any confidential, proprietary, or trade secret information owned by KIOSK. Admitted that Cole Kepro received correspondence from counsel for KIOSK concerning Mr. Nebola and Mr. Lightsey. Cole Kepro lacks knowledge or information about the remaining allegations in Paragraph 7 and on that basis, denies them.**

**ANSWER BY NEBOLA AND LIGHTSEY: Admitted that KIOSK sent Mr. Nebola and Mr. Lightsey demand letters after their departure from KIOSK threatening them and seeking to intimidate them. Denied that Mr. Nebola and Mr. Lightsey took any confidential, proprietary, or trade secret information from KIOSK. Mr. Nebola and Lightsey deny the remaining allegations in Paragraph 7.**

**ANSWER BY NEBOLA AND LIGHTSEY: Denied that Mr. Nebola or Mr. Lightsey solicited Mr. Rasmussen to join Cole Kepro / American Kiosks in violation of their agreements with KIOSK. Mr. Rasmussen lacks knowledge or information about the remaining allegations in Paragraph 7 an on that basis, denies them.**

8. On information and belief, by at least May 2022, Nebola and Lightsey poached Rasmussen, KIOSK's Prototype Systems Manager, to join American Kiosks as their Product Operations Manager. Cole Kepro / American Kiosks, Nebola, and Lightsey were all well-aware of the KIOSK trade secrets and confidential and proprietary

information Rasmussen had— especially regarding KIOSK's prototypes for KIOSK's more recent customers.

**ANSWER: Admitted that Mr. Rasmussen joined Cole Kepro in approximately June 2021. Defendants deny the remaining allegations in Paragraph 8.**

9.      On or about August 17, 2022, KIOSK—through its attorneys—expressed its concern to Cole Kepro / American Kiosks regarding Nebola, Lightsey, and Rasmussen's taking of KIOSK's trade secrets and confidential and proprietary information.

**ANSWER: Admitted KIOSK sent a letter to Defendants' attorneys dated August 17, 2022 erroneously accusing Defendants of misconduct.  Defendants deny the remaining allegations in Paragraph 9.**

10.     KIOSK has since discovered that American Kiosks has indeed incorporated KIOSK's trade secrets and confidential and proprietary information in American Kiosks' products, including for a KIOSK customer, Bitcoin of America ("BOA"). While still employed at KIOSK, both Nebola and Lightsey helped design a prototype for BOA. Lightsey was actively involved in the component selection working with KIOSK's suppliers, detailed costing analysis, and margin models for the proposed kiosk for BOA. Nebola worked closely with pricing and gained invaluable knowledge of the component prices and costs associated with the prototype for BOA.

**ANSWER BY COLE KEPRO: Cole Kepro denies ever having received or used any confidential or trade secret information owned by KIOSK. Cole Kepro lacks knowledge or information about the details of Mr. Nebola and Mr. Lightsey's specific responsibilities and day-to-day activities at KIOSK and on that basis,**

**denies those allegations. Cole Kepro denies all remaining allegations in Paragraph 10.**

**ANSWER BY NEBOLA AND LIGHTSEY: Mr. Nebola and Mr. Lightsey deny ever having taken any confidential or trade secret information owned by KIOSK, or ever having used any such information for any purpose after leaving KIOSK. Admitted that Mr. Lightsey worked on a prototype for BOA at KIOSK, including proposed components and possible suppliers. Admitted that Mr. Nebola worked on pricing of a possible sale to BOA. Denied that Mr. Nebola worked on the technical design or other technical aspects of the BOA prototype. Denied that component selection or pricing constitute confidential or trade secret information. Denied that KIOSK made any sales or otherwise consummated a business relationship with BOA at any point prior to Mr. Nebola and Mr. Lightsey's departure from KIOSK. Mr. Nebola and Mr. Lightsey deny all remaining allegations in Paragraph 10.**

11.     KIOSK has suffered, is suffering, and will continue to suffer substantial and irreparable harm from the theft and misuse of its confidential, proprietary, and trade secret information. Defendants' wrongful acts constitute, among other things, breach of contract, misappropriation of trade secrets, interference with prospective business advantage, unfair competition, and unjust enrichment. In so doing, Defendants have caused KIOSK considerable damage.

**ANSWER: Denied.**

## THE PARTIES

12.     Plaintiff KIOSK Information Systems, Inc. is a Colorado corporation with its principal place of business located at 346 South Arthur Avenue, Louisville, Colorado 80027.

**ANSWER: Defendants lack knowledge and information about KIOSK's current legal organization and the current, full geographic scope of its operations, and on this basis, deny the allegations in Paragraph 12.**

13.     Defendant Cole Kepro International, LLC is a Nevada limited liability company, with its principal place of business located at 4170 Distribution Circle, North Las Vegas, Nevada 89030.

**ANSWER: Admitted.**

14.     Defendant American Kiosks is a Colorado based entity with its principal place of business located at 10901 W 120th Ave Ste 130, Broomfield, Colorado 80021. On information and belief, American Kiosks is a subsidiary of Cole Kepro (*see* https://americankiosks.com/contact-us/ (last accessed January 13, 2023 at 9:18am.)) On information and belief, American Kiosks is the registered trade name used by Cole Kepro in the business of designing, developing, and selling kiosks in the State of Colorado. On information and belief, American Kiosks is and at all times herein mentioned was the alter ego of Cole Kepro, and there exists, and all times herein mentioned has existed, a unity of interest and ownership between Cole Kepro and American Kiosks such that any separateness between them ceased to exist, in that Cole Kepro completely controlled,

dominated, managed, and operated American Kiosks. The terms "Cole Kepro" and "American Kiosks" therefore mean the same and are used interchangeable herein.

**ANSWER: Admitted that American Kiosks is a trade name and division of Cole Kepro. Denied that American Kiosks is a separate legal entity or legal subsidiary. Admitted that the American Kiosks division has an office at 10901 W. 120th Ave Ste 130, Broomfield, Colorado 80021. Admitted that the American Kiosks division of Cole Kepro designs, manufactures, and sells kiosks. Denies that it does so exclusively in Colorado. The remaining allegations in Paragraph 14 are legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny those allegations.**

15.    Defendant Eric Nebola is an individual who is domiciled in Colorado and is the President of American Kiosks. On information and belief, Nebola currently resides at 13034 Magnolia Street, Thornton, Colorado 80602 and works and has an office at American Kiosks in Broomfield, Colorado.

**ANSWER: Denied that American Kiosks is a separate legal entity. Mr. Nebola admits the remaining allegations in Paragraph 15.**

16.    Defendant Taylor "Tucker" Judson Lightsey is an individual who is domiciled in Colorado and is Vice President of American Kiosks. On information and belief, Lightsey currently resides at 11929 Mountview Lane, Broomfield, Colorado 80021 and also works and has an office at American Kiosks in Broomfield, Colorado.

**ANSWER: Denied that American Kiosks is a separate legal entity. Mr. Lightsey  admits the remaining allegations in Paragraph 15.**

17.     Defendant Michael Rasmussen is an individual who is domiciled in Colorado and, on information and belief, currently resides at 603 Eaton Circle, Superior, CO 80027 and works and has an office at American Kiosks in Broomfield, Colorado.

**ANSWER: Admitted that Mr. Rasmussen is an individual who is domiciled in Colorado. Admitted that Mr. Rasmussen works at Cole Kepro's American Kiosks office in Broomfield, Colorado. Mr. Rasmussen denies the remaining allegations in Paragraph 17.**

## JURISDICTION AND VENUE

18.     The contracts between KIOSK and Nebola, Lightsey, and Rasmussen, respectively, that give rise to this action were executed and performed, at least in part, at KIOSK's offices in Louisville, Colorado. This Court has personal jurisdiction over each of the Defendants because the acts alleged occurred, in whole or in part, within this District. Moreover, Defendants have committed tortious acts within the District and have committed tortious acts that have caused injury to KIOSK within the District. This Court also has personal jurisdiction over Defendants Nebola, Lightsey, and Rasmussen because they are residents of this District.

**ANSWER: Admitted that this Court has personal jurisdiction over Defendants. Admitted that the Executive Confidentiality Assignment Agreements signed by Messrs. Nebola, Lightsey, and Rasmussen were signed in Colorado. Admitted that Nebola, Lightsey, and Rasmussen live in the District of Colorado. Defendants deny all remaining allegations in Paragraph 18.**

11

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action alleges a claim arising under the laws of the United States. This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to pursuant to 28 U.S.C. § 1367.

**ANSWER: Admitted that this Court has subject matter jurisdiction over KIOSK's Federal Defend Trade Secret Act claim, and that supplemental jurisdiction currently exists. Denied that supplemental jurisdiction would continue to exist in the absence of the Defend Trade Secret Act claim.**

20.     Venue in this Court is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because contracts which give rise to this dispute were to be performed in this District, and a substantial part of the events giving rise to the claims asserted herein occurred in this District.

**ANSWER: Admitted that venue is proper in this District. Admitted that the Executive Confidentiality Assignment Agreements signed by Messrs. Nebola, Lightsey, and Rasmussen were signed in this District. Admitted that some of the events at issue in this dispute took place in part in Colorado. Denied that KIOSK has any valid claims.**

## FACTS RELEVANT TO ALL CLAIMS

### A.    KIOSK's Business and Proprietary Information

21.     KIOSK designs, manufactures, develops software, and provides support for standard and customized self-service kiosk machines. In the nearly three decades that it has been involved in the kiosk business, KIOSK has deployed more than 250,000 kiosk

units to businesses in a variety of industries, including finance and cryptocurrency, gaming, government, healthcare, hospitality, retail, storage, transportation, and tourism across a variety of applications and use cases. KIOSK has become one of the leading providers of self-service kiosk machines in the United States.

**ANSWER BY COLE KEPRO: Admitted that KIOSK designs, manufactures, and provides support for kiosks. Cole Kepro lacks knowledge or information concerning the additional details of KIOSK's operations and history, and on that basis, denies those allegations. Cole Kepro denies the remaining allegations in Paragraph 21.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that KIOSK designs, manufactures, develops software, and provides support for kiosks. The Employee Defendants lack knowledge or information concerning the specific date KIOSK was founded, the precise number of units KIOSK has sold, and the complete list of industries in which KIOSK has operated, and on that basis, denies those allegations. The Employee Defendants deny the remaining allegations in Paragraph 21.**

22.     KIOSK's offerings are all-inclusive, enabling KIOSK to control project quality and timing from design through manufacturing through deployment to the customer and ongoing service. KIOSK has an experienced in-house team of employees with niche expertise in a variety of key disciplines, as well as specialized design and mechanical engineering personnel.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about the allegations in Paragraph 22 and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that KIOSK offers kiosk design and manufacturing. Admitted that, at least in the past, KIOSK has had employees, including those with experience in design and mechanical engineering. The Employee Defendants deny the remaining allegations in Paragraph 22.**

23.     One of KIOSK's key competitive advantages in the industry is its substantial investment in the training and development of its personnel and developing new technology and business processes so that it can provide state-of-the-art services and products to its customers.  KIOSK's most valuable resources are its employees and intellectual property, including KIOSK's trade secrets that it carefully developed over the course of nearly 30 years.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about the allegations in Paragraph 23 and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Denied.**

24.     For nearly 30 years, KIOSK has developed certain trade secrets as part of its kiosk business, including but not limited to its customer list and business and technical information for each customer, including contact information, pricing and historical purchasing information, training information, and customers' customized solutions created based on their specific business and technical needs and preferences. KIOSK has expended and invested a substantial amount of time, energy, and money compiling

this valuable information. These trade secrets give KIOSK a competitive edge in the ever competitive kiosk industry.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about the allegations in Paragraph 24 and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants lack knowledge or information about what KIOSK considers its confidential or trade secret information and on that basis, denies those allegations. The Employee Defendants deny the remaining allegations in Paragraph 24.**

25.     KIOSK has, at all times mentioned herein, employed reasonable efforts to protect its trade secrets and other proprietary and confidential information with respect to its business, employees, customers, products, and services, including technical and pricing information regarding its products and market intelligence.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about the allegations in Paragraph 25 and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants lack knowledge or information about what KIOSK considers its confidential or trade secret information and on that basis, denies those allegations. The Employee Defendants deny the remaining allegations in Paragraph 25.**

26.     KIOSK takes a number of steps to protect its confidential, proprietary, and trade secret information. KIOSK has implemented internal polices applicable to all employees that protect KIOSK's confidential, proprietary, and trade secret information.

a.   As a general practice, KIOSK's employment contracts contain provisions that ensure KIOSK owns all work product and developments created by its employees and that those employees are required to maintain, both during and after the term of employment, the confidentiality of all such information.

b.   All KIOSK employees are required to review KIOSK's employee policies— including its policy of confidentiality, which are widely accessible to all employees on KIOSK's employee intranet, SharePoint. KIOSK's employee intranet also sets forth polices on avoiding conflicts of interest with competitors.

c.   KIOSK further protects its confidential and proprietary information by utilizing security cameras and limiting entry to KIOSK's buildings only to those with keycards. KIOSK provides no public entry to its buildings.

d.   KIOSK also individually assigns unique IDs and passwords to each employee for access to KIOSK's servers and limits access to files based on the specific security clearance of each employee.

e.   KIOSK conducts exit interviews with each departing employee, during which it reminds the employee of their confidentiality obligations and the employee returns their building access keys, among other things. Afterwards, KIOSK immediately terminates the employee's access to KIOSK's servers.

f.   KIOSK also attempts to enter into agreements or acknowledgements with departing employees that remind them of their continuing obligations to

KIOSK regarding the protection of KIOSK's proprietary and confidential information.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about the allegations in Paragraph 26 and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants lack knowledge or information about what KIOSK considers its confidential or trade secret information and on that basis, denies those allegations. The Employee Defendants lack knowledge or information about KIOSK's policies "applicable to all employees" and on that basis, denies those allegations.**

**(a) The Employee Defendants lack knowledge or information about KIOSK's employment contracts, other than their own, and on that basis, deny the allegations concerning KIOSK's "general practice" concerning such contracts.**

**(b) The Employee Defendants lack knowledge or information about KIOSK's requirements for "all employees," and on that basis, deny the allegations concerning KIOSK's purported requirement that all employees review certain policies. The Employee Defendants lack knowledge or information about the specific location, completeness, or details of KIOSK's employee policies and on that basis, deny those allegations.**

**(c) The Employee Defendants admit that KIOSK has security cameras at its office and that KIOSK employees used keycards to access the KIOSK building. The Employee Defendants lack information about KIOSK's purported access policies for its office and on that basis, deny those allegations.**

**(d) While the Employee Defendants are aware they had IDs and passwords for their accounts at KIOSK, they lack knowledge or information about KIOSK's purported assignment of IDs and passwords for "each employee" for access to files and servers and on that basis, deny those allegations.**

**(e) The Employee Defendants lack knowledge or information about KIOSK's purported practice of conducting exit interviews with "each departing employee" and terminating file access and on that basis, deny those allegations.**

**(f) The Employee Defendants lack knowledge or information about KIOSK's purported practice of "attempt[ing] to enter into agreements or acknowledgements with departing employees" and on that basis, deny those allegations.**

**The Employee Defendants deny the remaining allegations in Paragraph 26.**

27.     KIOSK also requires its employees to sign confidentiality and non-solicitation agreements. The confidentiality provisions preclude KIOSK employees from using or disclosing confidential information related to its business. These agreements also preclude KIOSK employees from "directly or indirectly" soliciting their coworkers for employment somewhere else. KIOSK also requires its employees to read a Business Ethics Code of Conduct Policy. This Policy explicitly states that confidential information must be "carefully controlled and protected." Further, the majority of KIOSK's marketing, pricing, and training and development material is labeled "confidential" and/or "for internal use only." KIOSK also includes confidentiality clauses in its contracts with its customers and distributors.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about the allegations in Paragraph 27 and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants lack knowledge or information about KIOSK's purported practice requiring all employees to sign confidentiality and non-solicitation agreements. They further lack knowledge or information concerning the contents of any agreements between KIOSK and its employees, other than their own. On that basis, the Employee Defendants deny the allegations in Paragraph 27 concerning employee agreements. The Employee Defendants lack information about the "majority" of KIOSK's "marketing, pricing, and training and development material" and on that basis, deny allegations about that topic. The Employee Defendants lack information all of KIOSK's customer contracts and on that basis, deny the allegations about those contracts. The Employee Defendants deny the remaining allegations in Paragraph 27.**

28.     Likewise, KIOSK has a practice of executing non-disclosure agreements with potential vendors and customers before sharing any proprietary or confidential information, and a practice of including confidentiality and non-disclosure provisions on its supplier and other agreements with vendors and customers.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about the allegations in Paragraph 28 and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that KIOSK sometimes executed non-disclosure agreements and / or provisions with vendors and**

customers that the Employee Defendants worked on during their time at KIOSK. The Employee Defendants lack knowledge or information concerning KIOSK's overall "practices" and on that basis, deny any suggestion concerning the regularity or uniformity of KIOSK's actions in this regard.

**B.      KIOSK's Sales and Product Team**

29.     For nearly 30 years, KIOSK carefully built a team of employees from the ground up to design, manufacture, and sell self-service solutions, including self-service kiosk machines. Some key members of KIOSK's sales and products team are identified herein.

**ANSWER BY COLE KEPRO: Defendants lack knowledge or information about the allegations in Paragraph 29 and on that basis, deny them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that KIOSK employed people involved in the design, manufacture and service of kiosks. The Employee Defendants deny the remaining allegations in Paragraph 29.**

30.     Nebola was employed by KIOSK for over 18 years, from approximately April 2003 through approximately October 2021. Nebola's initial role at KIOSK was a Mechanical Engineer; but through the opportunities provided at KIOSK, he rose through the ranks and became KIOSK's Vice President of Sales—the last position he held before joining competitor Cole Kepro / American Kiosks.

**ANSWER BY COLE KEPRO, LIGHTSEY, AND RASMUSSEN: Admitted that Mr. Nebola previously worked at KIOSK and joined Cole Kepro in approximately October 2021. Admitted that in some respects, Cole Kepro is a competitor to**

KIOSK. **Cole Kepro, Mr. Lightsey, and Mr. Rasmussen lack knowledge or information about the remaining allegations in Paragraph 30, and on that basis, deny them.**

**ANSWER BY NEBOLA: Admitted that Mr. Nebola worked for KIOSK for approximately 18 years, from approximately 2003 to October 2021. Mr. Nebola lacks knowledge or information about his precise start date and on that basis, denies that allegation. Admitted that Mr. Nebola started at KIOSK as a Mechanical Engineer. Admitted that Mr. Nebola was Vice President of Sales at the time of his departure from KIOSK. Admitted that in some respects, Cole Kepro is a competitor to KIOSK. Mr. Nebola denies the remaining allegations in Paragraph 30.**

31.     In his position as Vice President of Sales, Nebola had access to KIOSK's confidential and proprietary information and trade secrets, including but not limited to confidential information about KIOSK's customer database, customer agreements, customers' historical purchasing preferences, customers' key contact information, pricing, quotes, customers' business and technical needs and preferences, customers' service history, as well as confidential, proprietary, and trade secret information regarding KIOSK's product designs, engineering files (*e.g.*, CAD files), sales prospects, product plans, future product development initiatives, actual and planned product technical specifications, pricing and marketing strategy, cost/profit margins, bills of materials ("BOMs"), and component suppliers. Moreover, Nebola's access to KIOSK's Salesforce database granted him unqualified opportunities to personally engage with more than 8,000 of KIOSK's customers on KIOSK's proprietary customer list. Nebola was also

tasked with the responsibility to maintain and develop relationships with hundreds of KIOSK customers on behalf of KIOSK.

**ANSWER BY COLE KEPRO, LIGHTSEY, AND RASMUSSEN: Cole Kepro, Mr. Lightsey, and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 31, and on that basis, deny them.**

**ANSWER BY NEBOLA: Mr. Nebola lacks knowledge or information about what KIOSK considers to be its confidential and/or trade secret information, and on that basis, denies the allegations about such information. Admitted that as Vice President of Sales, Mr. Nebola had access to KIOSK's customer database, as well as certain customer agreements, contact information, pricing, quotes, sales prospects, product plans, product development initiatives, pricing and marketing strategy, cost/profit margins, and component suppliers. Because the terms used in Paragraph 31 are vague and subject to multiple interpretations, denied that as Vice President of Sales, Mr. Nebola had access to engineering files, technical specifications, product designs, bills of materials, or service histories. Denied that Mr. Nebola in any way misused or misappropriated any of the above information. Mr. Nebola denies the remaining allegations in Paragraph 31.**

32.     Lightsey was employed by KIOSK for nearly 14 years, from approximately November 2007 through approximately October 2021. His first role was an Engineering Intern; but similar to Nebola, through KIOSK's unwavering support of its employees, Lightsey climbed the ladder and eventually became Director of Product Management—his last position at KIOSK before joining competitor Cole Kepro / American Kiosks.

**ANSWER BY COLE KEPRO, NEBOLA, AND RASMUSSEN: Admitted that Mr. Lightsey previously worked at KIOSK and joined Cole Kepro in approximately October 2021. Admitted that in some respects, Cole Kepro is a competitor to KIOSK. Cole Kepro, Mr. Nebola, and Mr. Rasmussen lack knowledge or information about the remaining allegations in Paragraph 32, and on that basis, deny them.**

**ANSWER BY LIGHTSEY: Admitted that Mr. Lightsey worked for KIOSK for approximately 14 years, from approximately November 2007 to October 2021. Admitted that Mr. Lightsey started at KIOSK as an Engineering Intern. Admitted that Mr. Lightsey was Director of Product Management at the time of his departure from KIOSK. Admitted that in some respects, Cole Kepro is a competitor to KIOSK. Mr. Lightsey denies the remaining allegations in Paragraph 32.**

33.     In his position as Director of Project Management, Lightsey developed and had access to KIOSK's confidential and proprietary information, including, but not limited to, product plans, future product development initiatives, actual and planned product technical specifications, product designs, engineering files (*e.g.*, CAD files), bills of materials ("BOMs"), and component suppliers. Moreover, Lightsey's credentials gave him access to KIOSK's databases, which contain the contact and other vital information regarding over 8,000 KIOSK customers on KIOSK's proprietary customer list. Lightsey was also tasked with the responsibility to maintain and develop relationships with hundreds of KIOSK customers on behalf of KIOSK.

**ANSWER BY COLE KEPRO, NEBOLA, AND RASMUSSEN: Cole Kepro, Mr. Nebola, and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 33, and on that basis, deny them.**

**ANSWER BY LIGHTSEY: Mr. Lightsey lacks knowledge or information about what KIOSK considers to be its confidential and/or trade secret information, and on that basis, denies the allegations about such information. Admitted that Mr. Lightsey had access to certain of KIOSK's product plans, product development initiatives, product technical specifications, product designs, bills of materials, component suppliers, and customers in the scope of his employment with KIOSK. Because the terms used in Paragraph 31 are vague and subject to multiple interpretations, denied that as Director of Product Management, Mr. Lightsey had access to engineering files. Denied that Mr. Lightsey in any way misused or misappropriated any of the above information. Mr. Lightsey denies the remaining allegations in Paragraph 33.**

34.     Rasmussen was employed by KIOSK for nearly twenty-four years, from approximately July of 1998 through approximately June of 2022, with a break in employment from approximately February through December of 2015. Most recently, and at the time his employment at KIOSK ended, Rasmussen was KIOSK's Prototype Systems Manager.

**ANSWER BY COLE KEPRO, NEBOLA, AND LIGHTSEY: Admitted that Mr. Rasmussen previously worked at KIOSK. Cole Kepro, Mr. Nebola, and Mr. Lightsey**

lack knowledge or information about the remaining allegations in Paragraph 34, and on that basis, deny them.

ANSWER BY RASMUSSEN: Admitted.

35.　　In his position as Prototype Systems Manager, Rasmussen had access to KIOSK's confidential and proprietary information, including, but not limited, to engineering specifications for custom products, product configuration, and new prototype information. As a key team member, Rasmussen was constantly involved in prototype designs for numerous KIOSK customers, a role which also gave him direct access to hundreds of KIOSK customers.

ANSWER BY COLE KEPRO, NEBOLA, AND LIGHTSEY: Cole Kepro, Mr. Nebola, and Mr. Lightsey lack knowledge or information about the allegations in Paragraph 35, and on that basis, deny them.

ANSWER BY RASMUSSEN: Mr. Rasmussen lacks knowledge or information about what KIOSK considers to be its confidential and/or proprietary information, and on that basis, denies the allegations about such information. Admitted that Mr. Rasmussen had access to certain engineering specifications, product configurations, prototype information, and product designs at KIOSK. Denied that Mr. Rasmussen had access to native CAD files or the ability to modify or download such files. Mr. Rasmussen denies the remaining allegations in Paragraph 35.

C.　　Nebola, Lightsey, and Rasmussen's Agreements with KIOSK.

36.　　In connection with their employment at KIOSK as executives (having a manager level or above) and in addition to existing agreements with KIOSK, Nebola,

Lightsey, and Rasmussen were each required to enter into Executive Confidentiality Assignment Agreements with KIOSK—all dated February 22, 2021 (the "Confidentiality Agreements").

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about the allegations in Paragraph 36, and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that KIOSK forced the Employee Defendants to sign the Executive Confidentiality Assignment Agreements. The Employee Defendants deny the remaining allegations in Paragraph 36.**

37.     The Executed Confidentiality Agreements are attached hereto as **Exhibits 1, 2, and 3**, respectively. The obligations of the Confidentiality Agreements expressly survive termination of employment.

**ANSWER: Admitted that the Confidentiality Agreements are attached. Admitted that the Confidentiality Agreements purport to impose certain obligations beyond termination of employment.**

38.     The Confidentiality Agreement states that:

> It is desirable and in the best interests of the Company to protect confidential, proprietary and trade secret information, to prevent unfair competition by former employees of the Company following separation of their employment with the Company, and to secure cooperation from former employees with respect to matters related to their employment with the Company.
>
> Executive acknowledges that Executive's employment or continued employment with the Company depends on, among other things Executive's willingness to agree to and abide by

the non-disclosure and other covenants contained in this Agreement.

**ANSWER: Admitted that Paragraph 38 accurately quotes certain portions of the Confidentiality Agreement.**

39.     The Confidentiality Agreement further includes Non-Solicitation Covenants, stating that:

> **Non-Solicitation Covenants.** Executive covenants and agrees that during a period of one (1) year Executive will not on behalf of Executive or directly or indirectly through another person or entity (including without limitation as a proprietor, owner, principal, agent, partner, officer, director, employee manager, member, consultant or otherwise):
>
> Solicit, divert, take away, or otherwise attempt in any manner to solicit, divert, or take away, the business of any customer, supplier or other business relation of the Company or any of its Affiliates, that Executive knows, or reasonably should know, is a customer, supplier or other business relation of the Company, for a purpose that is related to a Restricted Business, or in any way interfere with the relationship between any such customer, supplier or other business relation and the Company or any of its Affiliates (including, without limitation, inducing such person or entity to cease doing business with the Company or any of its Affiliates or making any negative statements or communications about the Company or any of its Affiliates); or
>
> Solicit or induce to leave the Company any person who Executive knows, or reasonably should know, is then an employee, consultant, or contractor of the Company or any of its Affiliates or who was an employee, consultant or contractor of the Company or any of its Affiliates (with respect to the Company's or any of its Affiliate's business) at any time during the twelve-month period immediately preceding termination of Executive's employment with the Company. ...

**ANSWER: Admitted that Paragraph 39 accurately quotes certain portions of the Confidentiality Agreement.**

40.    The Confidentiality Agreement further includes a Use of Confidential Information section, stating that:

> **Executives Use of Confidential Information.** Executive will at all times during and after employment with the Company maintain the confidentiality of the Confidential Information. Executive will not, without Company's prior written consent, direct or indirectly: (1) copy or use any Confidential Information; or (2) show, give, sell disclose or otherwise communicate any Confidential Information to any person or entity other than the Company. ...

**ANSWER: Admitted that Paragraph 40 accurately quotes certain portions of the Confidentiality Agreement.**

**D.     Nebola's Solicitation of Lightsey and Their Diversion of KIOSK's Prospective Business Relationships**

41.    On information and belief, on August 12, 2021, Troy Owens, a talent acquisition and search consultant, contacted Nebola concerning a prospective employment opportunity with American Kiosks, a subsidiary of Cole Kepro, which Owens described as "a fast-growing new business in the kiosk space" that was looking to find a "leader and key hires" to build out its sales organization.

**ANSWER BY COLE KEPRO: Admitted that Cole Kepro engaged Troy Owens for recruitment purposes in 2021. Denied that American Kiosks is a legal subsidiary of Cole Kepro or that the d/b/a American Kiosk existed as of August 12, 2021. Cole Kepro lacks knowledge or information about the remaining allegations in Paragraph 41, and on that basis, denies them.**

**ANSWER BY NEBOLA: Admitted that Mr. Owens contacted Mr. Nebola about a potential employment opportunity with Cole Kepro in approximately August 2021.**

Mr. Nebola lacks knowledge or information about the remaining allegations in Paragraph 41, and on that basis, denies them.

**ANSWER BY LIGHTSEY AND RASMUSSEN: Mr. Lightsey and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 41 and on that basis, deny them.**

42.     On information and belief, on August 13, 2021, Nebola responded to Owens that he was interested in learning more about the opportunity.

**ANSWER BY COLE KEPRO, LIGHTSEY, AND RASMUSSEN: Cole Kepro, Mr. Lightsey, and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 42 and on that basis, deny them.**

**ANSWER BY NEBOLA: Admitted that Mr. Nebola responded to Mr. Owens and expressed interest in continuing the discussion. Mr. Nebola lacks knowledge or information about the date of his response, and on that basis, denies the remaining allegations in Paragraph 42.**

43.     On information and belief, over the weeks that followed, Nebola engaged in a scheme in which he made it appear as though he was acting on behalf of KIOSK and in KIOSK's best interest, when Nebola's true motive was to actually poach KIOSK's employees and divert business away from KIOSK to his soon-to-be employer.

**ANSWER BY COLE KEPRO, LIGHTSEY, AND RASMUSSEN: Cole Kepro, Mr. Lightsey, and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 43 and on that basis, deny them.**

**ANSWER BY NEBOLA: Denied.**

44.     On or about August 20 through August 23, 2021, through further email exchanges with Owens, Nebola arranged to meet with Andrew Cashin, Cole Kepro's President and CFO, while Nebola was already scheduled to be in Las Vegas on behalf of KIOSK for a business meeting with one of KIOSK's customers scheduled for the morning of August 25, 2021.

**ANSWER BY COLE KEPRO: Admitted that Andrew Cashin met with Mr. Nebola in Las Vegas on or about August 25, 2021. Cole Kepro lacks knowledge or information about the remaining allegations in Paragraph 44, and on that basis, denies them.**

**ANSWER BY NEBOLA: Admitted that Andrew Cashin met with Mr. Nebola in Las Vegas on or about August 25, 2021. Admitted that Mr. Nebola emailed with Mr. Owens about that meeting. Admitted that Mr. Nebola was already planning to be in Las Vegas around that time for a KIOSK business meeting with an existing Cole Kepro customer. Denied this meeting was with a KIOSK customer.  Mr. Nebola lacks knowledge or information about the remaining allegations in Paragraph 44, and on that basis, denies them.**

**ANSWER BY LIGHTSEY AND RASMUSSEN: Mr. Lightsey and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 44 and on that basis, deny them.**

45.     On August 25, 2021, on behalf of KIOSK, Nebola, Lightsey, and KIOSK's Director of Sales, Joe Sawicki, met with a KIOSK customer in Las Vegas. Though the meeting was scheduled to begin at 11 a.m. Pacific Time, Nebola arrived late. On

information and belief, Nebola arrived late because he was meeting with Cashin and/or others at Cole Kepro.

**ANSWER BY COLE KEPRO: Admitted that Andrew Cashin met with Mr. Nebola in Las Vegas on or about August 25, 2021. Cole Kepro lacks knowledge or information about the remaining allegations in Paragraph 45, and on that basis, denies them.**

**ANSWER BY NEBOLA: Admitted that Andrew Cashin met with Mr. Nebola in Las Vegas on or about August 25, 2021. Admitted that Messrs. Nebola, Lightsey, and Sawicki met with an existing Cole Kepro customer in Las Vegas on August 25, 2021. Denied that the meeting was with a KIOSK Customer. Admitted that Mr. Nebola was a few minutes late to the meeting.  . Mr. Nebola denies the remaining allegations in Paragraph 44.**

**ANSWER BY LIGHTSEY: Admitted that Messrs. Nebola, Lightsey, and Sawicki met with an existing Cole Kepro customer in Las Vegas on August 25, 2021. Admitted that Mr. Nebola was a few minutes late to the meeting.  Mr. Lightsey lacks knowledge or information about the remaining allegations in Paragraph 45 and on that basis, deny them.**

**ANSWER BY RASMUSSEN: Mr. Rasmussen lacks knowledge or information about the allegations in Paragraph 45 and on that basis, denies them.**

46.     Nebola's trip to Las Vegas was on KIOSK's company time, and it was paid for entirely by KIOSK.

**ANSWER BY COLE KEPRO, LIGHTSEY, AND RASMUSSEN: Cole Kepro, Mr. Lightsey, and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 46 and on that basis, deny them.**

**ANSWER BY NEBOLA: Admitted that KIOSK paid for Mr. Nebola's travel expenses to visit a KIOSK customer on or about August 25, 2021. Denied that Mr. Nebola's trip was improper in any way.**

47.     On information and belief, on September 29, 2021, Nebola again traveled to Las Vegas to meet and/or interview with Cole Kepro. Although he was in Las Vegas, Nebola falsely represented to KIOSK that he was in Estes Park, Colorado.

**ANSWER BY COLE KEPRO: Admitted that Mr. Nebola met with Cole Kepro in Las Vegas in September 2021. Cole Kepro lacks knowledge or information about the remaining allegations in Paragraph 47, and on that basis, denies them.**

**ANSWER BY NEBOLA: Admitted that Mr. Nebola met with Cole Kepro in Las Vegas in September 2021. Mr. Nebola lacks knowledge or information about the specific date or Mr. Nebola's contemporaneous communications to KIOSK about the travel, if any, alleged in Paragraph 47, and on that basis, denies that allegation. Mr. Nebola denies the remaining allegations in Paragraph 47.**

**ANSWER BY LIGHTSEY AND RASMUSSEN: Mr. Lightsey and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 47 and on that basis, deny them.**

48.     On October 4, 2021, Nebola attempted to send KIOSK's contracts with its client, CSG, to Lightsey via email. On information and belief, Nebola attempted to send

these contracts for Cole Kepro's use and benefit; however, Lightsey was unable to access the attached contracts.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Cole Kepro and Rasmussen lack knowledge or information about the allegations in Paragraph 48, and on that basis, deny them.**

**ANSWER BY NEBOLA: Mr. Nebola lacks knowledge or information about the details of his email activity using his KIOSK email account within the scope of his employment. Denied that Mr. Nebola acted or attempted to act improperly in any way vis-à-vis CSG.**

**ANSWER BY LIGHTSEY. Denied that Mr. Lightsey acted or attempted to act improperly in any way vis-à-vis CSG. Mr. Lightsey lacks knowledge or information about the remaining allegations in Paragraph 48, and on that basis, deny them.**

49.     On October 5, 2021, Jared Muzzey, Account Executive for KIOSK, introduced Nebola to Sonny Meraban, CEO of BOA, in order to include Nebola in ongoing discussions concerning BOA's prospective purchase of 1000 kiosk units from KIOSK.

**ANSWER BY COLE KEPRO, LIGHTSEY, AND RASMUSSEN: Cole Kepro, Mr. Lightsey, and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 49 and on that basis, deny them.**

**ANSWER BY NEBOLA: Admitted that Mr. Nebola worked with Mr. Meraban on a potential purchase of 1000 kiosks from KIOSK by BOA. Mr. Nebola lacks knowledge or information about the specific source of BOA's referral to KIOSK,**

**and on that basis, denies those allegations. Mr. Nebola denies the remaining allegations in Paragraph 49.**

50.     By the time Nebola was introduced to Meraban, BOA had already stated an intent to purchase 1000 kiosk units from KIOSK, and BOA and KIOSK were close to finalizing the terms of this proposed order. Among other things, Meraban had asked Muzzey: "Are we good on the order?" and whether the proposed payment plan was acceptable.

**ANSWER BY COLE KEPRO, LIGHTSEY, AND RASMUSSEN: Cole Kepro, Mr. Lightsey, and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 50 and on that basis, deny them.**

**ANSWER BY NEBOLA: Mr. Nebola lacks knowledge or information about what Mr. Meraban may have told Mr. Muzzey and on that basis, denies those allegations. Mr. Nebola denies the remaining allegations in Paragraph 50.**

51.     Upon Nebola's introduction to Meraban on Tuesday, October 5, 2021, Nebola set up a call with Meraban and others on the KIOSK account team to "finalize the terms" of the sale.

**ANSWER: Defendants lack knowledge or information about the allegations in Paragraph 51 and on that basis, deny them.**

52.     On the same day, Nebola sent Lightsey a KIOSK Sales Quote to BOA for 1000 units, and a KIOSK Sales Quote to BOA for 500 units. On information and belief, Nebola intentionally did not include the KIOSK account team on that correspondence. On

information and belief, Nebola instead sent this information to Lightsey for Cole Kepro's and American Kiosks' use and benefit.

**ANSWER BY COLE KEPRO: Denied that Cole Kepro has received or used any protected KIOSK information. Cole Kepro lacks knowledge or information about the remaining allegations in Paragraph 52, and on that basis, denies them.**

**ANSWER BY NEBOLA: Mr. Nebola lacks knowledge or information about the details of his KIOSK email account and/or activities, and on that basis, denies such allegations. Denied that Mr. Nebola conveyed any protected KIOSK information to Cole Kepro. Mr. Nebola denies the remaining allegations in Paragraph 52.**

**ANSWER BY LIGHTSEY: Denied that Mr. Lightsey conveyed any protected KIOSK information to Cole Kepro. Mr. Lightsey lacks knowledge or information about the remaining allegations in Paragraph 52 and on that basis, denies them.**

**ANSWER BY RASMUSSEN: Mr. Rasmussen lacks knowledge or information about the allegations in Paragraph 52 and on that basis, denies them.**

53.     On October 6, 2021, Nebola and Lightsey traveled to Chicago, on behalf of KIOSK, to attend the National Association of Convenience Stores (NACS) Show. Their trip to Chicago was on company time and was paid for entirely by KIOSK.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 53 and on that basis, deny them.**

**ANSWER BY NEBOLA AND LIGHTSEY: Admitted that in early October 2021, Mr. Nebola and Mr. Rasmussen traveled to Chicago to attend the National**

35

**Association of Convenience Stores (NACS) Show. Admitted that KIOSK paid for their travel arrangements. Mr. Nebola and Mr. Lightsey deny the remaining allegations in Paragraph 53**

54. Also, on October 6, 2021, KIOSK and BOA exchanged further correspondence aimed at finalizing BOA's order of KIOSK's units, including the negotiation of payment terms. During the course of those communications, BOA's CFO, Paul Bialobrzewski, proposed an order of 1000 units and a payment schedule for that order, and he proposed an alternative order of 500 units and a payment schedule for those units.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 54 and on that basis, deny them.**

**ANSWER BY NEBOLA AND LIGHTSEY: Admitted that KIOSK and BOA discussed the potential sale on or about October 6, 2021. Mr. Nebola and Mr. Lightsey lack knowledge or information about the remaining allegations in Paragraph 55 and on that basis, deny them**

55. On the evening of October 6, 2021, Nebola, Lightsey, and Muzzey met BOA's executive team for dinner in Chicago on behalf of KIOSK.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 55 and on that basis, deny them.**

**ANSWER BY NEBOLA AND LIGHTSEY: Admitted that on or about October 6, 2021, Nebola, Lightsey, and Muzzey met representatives from BOA's executive team for dinner.**

56.     On Thursday, October 7, 2021, Nebola and Lightsey returned home from Chicago—a day earlier than originally planned.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 56 and on that basis, deny them.**

**ANSWER BY NEBOLA AND LIGHTSEY: Admitted that on or about October 7, 2021, Nebola and Lightsey returned home from Chicago earlier than planned because Mr. Lightsey had been robbed at gunpoint and had no money or identification.**

57.     Also, on October 7, 2021, Nebola emailed Samantha Miller, COO for BOA, his cell phone number and requested that she call him as soon as possible. On information and belief, on the same day, Nebola and Lightsey advised Miller that they were leaving KIOSK to join a competitor, and that she should wait to place her kiosk order—that is, that BOA should refrain from proceeding with placing its order of 1000 kiosk units with KIOSK.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 57 and on that basis, deny them.**

**ANSWER BY NEBOLA AND LIGHTSEY: Admitted that on or about October 7, 2021, Mr. Nebola called Ms. Miller to inform her about the robbery. Mr. Nebola and Mr. Lightsey deny the remaining allegations in Paragraph 57.**

58.    On October 11, 2021, Nebola resigned from KIOSK.

**ANSWER BY COLE KEPRO, LIGHTSEY, AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 58 and on that basis, deny them.**

**ANSWER BY NEBOLA: Admitted that on or about October 11, 2021, Mr. Nebola resigned from KIOSK.**

59.    On October 16, 2021, Lightsey resigned from KIOSK.

**ANSWER BY COLE KEPRO, NEBOLA, AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 59 and on that basis, deny them.**

**ANSWER BY LIGHTSEY: Admitted that on or about October 16, 2021, Mr. Lightsey resigned from KIOSK.**

60.    On November 11, 2021, Cole Kepro filed a Statement of Trade Name of a Reporting Entity with the Colorado Secretary of State, registering American Kiosks as the trade name under which Cole Kepro would be engaging in the business of designing, developing, and selling kiosks in the State of Colorado.

**ANSWER BY COLE KEPRO, NEBOLA AND LIGHTSEY:  Admitted.**

**ANSWER BY RASMUSSEN: Mr. Rasmussen lacks knowledge or information about the allegations in Paragraph 60 and on that basis, deny them.**

61.     On December 7, 2021, KIOSK President, Kim Kenney, and Sawicki traveled to Las Vegas to meet with Coin Cloud. In that meeting, Coin Cloud's COO, James Bauer, informed them that Cole Kepro's President and CFO, Cashin, had requested a meeting to give Coin Cloud an important update. Cashin then stated to Bauer that Cole Kepro had hired Nebola and Lightsey, KIOSK's two key players, and that KIOSK was "gutted" and no longer a viable kiosk supplier.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about conversations between KIOSK and Coin Cloud, and on that basis, deny those allegations. Admitted that at some point after hiring Mr. Nebola and Mr. Lightsey, Cole Kepro informed Coin Cloud about the hiring. Cole Kepro denies the remaining allegations in Paragraph 61.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants lack knowledge or information about the allegations in Paragraph 61, and on that basis, deny them.**

62.     On January 21, 2022, at the National Retail Federation (NRF) Conference & Expo in New York, New York, Coin Cloud's executives informed KIOSK that Cashin had again contacted them, and again stated that Coin Cloud should not be doing business with KIOSK.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information about conversations between KIOSK and Coin Cloud, and on that basis, deny those allegations. Cole Kepro denies the remaining allegations in Paragraph 61.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants lack knowledge or information about the allegations in Paragraph 62, and on that basis, deny them.**

63.     On February 9, 2022, at the ATM Industry Association (ATMIA) conference in Orlando, Florida, BOA's COO, Miller, told Sawicki and Muzzey of KIOSK about her October 7, 2021 exchange with Nebola and Lightsey—that, on October 7, 2021, Nebola and Lightsey advised Miller that they were leaving KIOSK to join a competitor and that BOA should refrain from proceeding with placing its order of 1000 kiosk units with KIOSK.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information about the allegations in Paragraph 63, and on that basis, deny them.**

**ANSWER BY NEBOLA AND LIGHTSEY: Mr. Nebola and Mr. Lightsey lack knowledge or information about conversations between BOA and KIOSK after their departure from KIOSK and on that basis, deny those allegations. Mr. Nebola and Mr. Lightsey deny the remaining allegations in Paragraph 63.**

64.     Miller also informed Sawicki and Muzzey that BOA no longer intended to place an order for 1000 kiosks from KIOSK and would instead be dual sourcing a pilot order between KIOSK and Cole Kepro.

**ANSWER: Defendants lack information about the allegations in Paragraph 64, and on that basis, deny them.**

**E.     Defendants Continue to Raid KIOSK's Employees While Openly Competing and Targeting KIOSK Customers Using KIOSK's Trade Secrets**

65. Cole Kepro, American Kiosks, Nebola, and Lightsey's pursuit of KIOSK's employees and customers did not stop there. On February 9, 2022, at the ATMIA conference, Cashin approached KIOSK employees at a lobby bar and told them that they would all be working for him soon.

**ANSWER BY COLE KEPRO: Admitted that Mr. Cashin made a joke to KIOSK employees at a conference about them working for Cole Kepro. Cole Kepro denies the remaining allegations in Paragraph 65.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants lack knowledge or information about the allegations in Paragraph 65 and on that basis, deny them.**

66. On May 18, 2022, Cole Kepro offered KIOSK employee Michael Rasmussen the position of Product Operations Manager. On information and belief, Rasmussen was recruited by Nebola and Lightsey, in violation of their Executive Confidentiality Assignment Agreements.

**ANSWER: Admitted the Cole Kepro offered Mr. Rasmussen a position in approximately May 2022. Defendants deny the remaining allegations in Paragraph 66.**

67. Upon leaving KIOSK, Rasmussen informed KIOSK that he was leaving to move to Arizona to start a new career with his sister—a career that consisted of home remodeling with no connection to kiosks. In actuality, Rasmussen had already accepted Cole Kepro's job offer as American Kiosks' Product Operations Manager.

**ANSWER BY COLE KEPRO, NEBOLA, AND LIGHTSEY: Cole Kepro, Mr. Nebola, and Mr. Lightsey lack knowledge or information about the allegations in Paragraph 67, and on that basis, deny them.**

**ANSWER BY RASMUSSEN: Admitted that Mr. Rasmussen considered leaving KIOSK and moving to Arizona to start a new career in real estate with his sister. Admitted that Mr. Rasmussen may have shared these plans at some point with KIOSK. Mr. Rasmussen denies the remaining allegations in Paragraph 67.**

68.     In his position as Prototype Systems Manager at KIOSK, Rasmussen had access to confidential information and trade secrets, including, but not limited, to proprietary information regarding engineering specifications for custom products, product configuration, and component sourcing.

**ANSWER BY COLE KEPRO, NEBOLA, AND LIGHTSEY: Cole Kepro, Mr. Nebola, and Mr. Lightsey lack knowledge or information about the allegations in Paragraph 68, and on that basis, deny them.**

**ANSWER BY RASMUSSEN: Mr. Rasmussen lacks knowledge or information about what confidential information and/or trade secrets KIOSK claims to possess, and on that basis, denies those allegations. Admitted that Mr. Rasmussen had access to certain engineering specifications, product configurations in the scope of his employment at KIOSK. Because that the terms used in Paragraph 68 are vague and subject to multiple interpretations, denied that Mr. Rasmussen had access to component sourcing. Denied that Mr. Rasmussen had the ability to access native CAD files or the ability to modify or download CAD files. Denied that**

**Mr. Rasmussen took or in any way misused that information. Mr. Rasmussen denies all remaining allegations in Paragraph 68.**

69.     On information and belief, Defendants used KIOSK's confidential and proprietary information and trade secrets to engage in a scheme to disrupt KIOSK's business relationships and divert KIOSK's customers from KIOSK and towards Cole Kepro and American Kiosks. As an example, Defendants used KIOSK's confidential and proprietary information and trade secrets to design and develop a competing, and substantially similar kiosk for BOA. The Cole Kepro / American Kiosks BOA design incorporates nearly all of the components KIOSK quoted to BOA. A comparison showing the similarities between the KIOSK BOA proposed design and the Cole Kepro / American Kiosks design that was actually sold by BOA is shown below.



**ANSWER: Denied.**

70.     This side-by-side comparison of the kiosk that KIOSK designed for BOA and the kiosk that was actually sold by Cole Kepro / American Kiosks highlights the following key similarities that, on information and belief, the following components used in both kiosks are sourced from the same suppliers: identical 21.5' PCAP monitors; barcode scanners strategically placed in similar areas on the kiosk; Cryptera EPP pin pads both placed directly below the barcode scanners; the insert credit card readers both placed on the right side of the pin pad; 80mm thermal printers; and check scanners and bill acceptors placed next to each other.

**ANSWER: Denied.**

71.     In addition to its blatant copying of KIOSKS designs, Cole Kepro / American Kiosks copied entire sections of KIOSK's website and reproduced them on its website as shown below.

**KIOSK's Website:**



## Custom Design Overview

With over 28 years dedicated to customized design and integration, KIOSK has earned the reputation as The World's Leader in Custom Design. We have an outstanding Engineering Team including Industrial Design, Mechanical Engineers, and Safety / Compliance Engineering, who have crafted highly custom platforms for Fortune 100 clients. To accommodate the complexity of these custom projects, we've steadily expanded Technical Teams to surround every key project aspect with parallel Development and Project Management experts, greatly simplifying and accelerating our customer's path to market.

(https://kiosk.com/custom-kiosks/ - last accessed 1/13/2023).

**American Kiosks' Website:**

# CUSTOM DESIGN SOLUTION

At American Kiosks, steep customization is an ongoing daily demand. To accommodate this high demand, we've steadily expanded Technical Teams to surround every key project aspect with parallel development experts, greatly simplifying and accelerating our customer's path to market.

(https://americankiosk.com - last accessed 1/13/2023).

**KIOSK's Website:**

## Design Experience

For over 28 years, our capabilities have been exercised and proven across 17+ vertical markets, building an unparalleled experience base for our customers to tap into.

The unique appeal of working with KIOSK for kiosk designing is two-fold:

- ⊙ Agile and unrestrained solution design, completely eliminating "One Size Fits All" constraints.
- ⊙ "A-Game" Team Members orchestrating all project development tracks – with the unique benefit of being together under one roof:

Solution Teams Include:

- ⊙ Custom enclosure and software design
- ⊙ Expert integration and in-house manufacturing
- ⊙ Advanced Program Management over product life cycle
- ⊙ Remote Management and field support

(https://kiosk.com/custom-kiosks/ - last accessed 1/13/2023).

**American Kiosks' Website:**

# CUSTOM KIOSK

Work with our expert team to incorporate your brand's look and feel and create results that add value to your bottom line.

✔ Agile and unrestrained solution design
✔ Expert integration and manufacturing
✔ Remote Management and Field Services
✔ Advanced Program Management
✔ Top Talent Team Members orchestrating all project development

(https://americankiosk.com/custom-kiosk/ - last accessed 1/13/2023).

**ANSWER: Admitted that Paragraph 71 contains accurate excerpts of the respective websites as of the date of those websites. Defendants deny all remaining allegations in Paragraph 71.**

72.    On information and belief, Defendants continue to disclose and use KIOSK's trade secrets to KIOSK's detriment and to Defendants' benefit.

**ANSWER: Denied.**

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (Against Nebola, Lightsey, and Rasmussen)

73.    KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: Defendants incorporate the foregoing paragraphs of this Answer as if fully set forth herein.**

74.    Nebola, Lightsey, and Rasmussen each entered into the Confidentiality Agreement, pursuant to which they agreed, among other things, that: (1) for a period of one year following the termination of their employment, they would not "[s]olicit, divert, take away, or otherwise attempt in any manner to solicit, divert, or take away, the business

46

of any customer, supplier or other business relation of" KIOSK that they "know[], or reasonably should know, is a customer, supplier or other business relation of" KIOSK; or (2) "[s]olicit or induce to leave the Company any person who Executive knows, or reasonably should know, is then an employee ... of the Company ... at any time during the twelve-month period immediately preceding termination of Executive's employment with the Company...."

**ANSWER BY COLE KEPRO: Admitted that the Employee Defendants signed the Confidentiality Agreement. Admitted that Paragraph 74 accurately quotes portions of the Agreement. Cole Kepro lacks knowledge regarding the intent of the parties to the Agreements and on that basis, denies such allegations. Cole Kepro denies all remaining allegations in Paragraph 74.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that the Employee Defendants signed the Confidentiality Agreement. Admitted that Paragraph 74 accurately quotes portions of the Agreement. The Employee Defendants deny all remaining allegations in Paragraph 74.**

75.     The Confidentiality Agreement, to which Nebola, Lightsey, and Rasmussen agreed, further stated that: "Executive will at all times during and after employment with the Company maintain the confidentiality of the Confidential Information."

**ANSWER BY COLE KEPRO: Admitted that Paragraph 75 accurately quotes portions of the Agreement. Cole Kepro lacks knowledge regarding the intent of the parties to the Agreements and on that basis, denies such allegations. Cole Kepro denies all remaining allegations in Paragraph 75.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that the Employee Defendants signed the Confidentiality Agreement. Admitted that Paragraph 75 accurately quotes portions of the Agreement. The Employee Defendants deny all remaining allegations in Paragraph 75.**

76.    Nebola and Lightsey breached the Confidentiality Agreement by attempting to solicit, divert, and take away BOA's and Coin Cloud's business from KIOSK, and by soliciting, diverting, and taking away BOA's business from KIOSK.

**ANSWER: Denied.**

77.    Nebola further breached the Confidentiality Agreement by soliciting Lightsey to leave his employment with KIOSK.

**ANSWER: Denied.**

78.    Nebola and Lightsey further breached the Confidentiality Agreement by soliciting Rasmussen to leave his employment with KIOSK.

**ANSWER: Denied.**

79.    On information and belief, Nebola, Lightsey, and Rasmussen breached the Confidentiality Agreement by disclosing to Cole Kepro and American Kiosks confidential and proprietary information belonging to KIOSK.

**ANSWER: Denied.**

80.    KIOSK performed its obligations under its Confidentiality Agreements with Nebola, Lightsey, and Rasmussen.

**ANSWER: Denied.**

81.    As a direct and proximate result of Nebola, Lightsey, and Rasmussen's breach of their Confidentiality Agreements, KIOSK suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**ANSWER: Denied.**

**SECOND CLAIM FOR RELIEF**
**Breach of the Duty of Good Faith and Fair Dealing**
**(Against Nebola and Lightsey)**

82.    KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: This claim has been dismissed and no answer is required. *See* ECF No. 56.**

83.    The Confidentiality Agreement includes an implied covenant of good faith and fair dealing.

**ANSWER: This claim has been dismissed and no answer is required. *See* ECF No. 56. To the extent an answer is required, denied.**

84.    By entering into the Confidentiality Agreement, Nebola and Lightsey agreed to act in a manner consistent with the agreed common purpose and with the reasonable expectations of the parties to that agreement.

**ANSWER: This claim has been dismissed and no answer is required. *See* ECF No. 56. To the extent an answer is required, denied.**

85.    The Confidentiality Agreement provided Nebola and Lightsey considerable discretion with respect to their performance under the Confidentiality Agreement, including by entrusting Nebola and Lightsey with all aspects of their continued

employment with KIOSK, allowing Nebola and Lightsey to control KIOSK's prospective customers' and customers' information and documents, engaging in negotiations and otherwise developing relationships with KIOSK's prospective customers and customers, and developing relationships with KIOSK's other employees.

**ANSWER: This claim has been dismissed and no answer is required. *See* ECF No. 56. To the extent an answer is required, denied.**

86.    Nebola and Lightsey used the discretion conferred on them by the Confidentiality Agreement, and their associated continued employment, to act dishonestly, in a manner contrary to the agreed upon common purpose and the parties' reasonable expectations, and outside of accepted commercial practices to deprive KIOSK of the benefit of the Confidentiality Agreement, including by—while still employed at KIOSK—actively working to draw business and employees away from KIOSK for the benefit of Cole Kepro and American Kiosks.

**ANSWER: This claim has been dismissed and no answer is required. *See* ECF No. 56. To the extent an answer is required, denied.**

87.    As a direct and proximate result of Nebola and Lightsey's breach of the duty of good faith and fair dealing, KIOSK suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**ANSWER: This claim has been dismissed and no answer is required. *See* ECF No. 56. To the extent an answer is required, denied.**

**THIRD CLAIM FOR RELIEF**
**Intentional Interference with Contract**
**(Against Cole Kepro and American Kiosks)**

88.     KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: Defendants incorporate the foregoing paragraphs of this Answer as if fully set forth herein.**

89.     The Confidentiality Agreement is a valid, binding, and enforceable contract between Nebola and KIOSK, between Lightsey and KIOSK, and between Rasmussen and KIOSK, respectively.

**ANSWER: Denied.**

90.     Pursuant to the Confidentiality Agreement, Nebola and Lightsey agreed to refrain from soliciting, diverting, or taking away, or attempting to solicit, divert, or take away, "the business of any customer, supplier or other business relation of" KIOSK.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Admitted that Paragraph 90 accurately quotes portions of the Confidentiality Agreement. Cole Kepro and Mr. Rasmussen lack knowledge or information regarding the intent of the parties to the contract and on that basis, deny such allegations. Cole Kepro and Mr. Rasmussen deny the remaining allegations in Paragraph 90.**

**ANSWER BY NEBOLA AND LIGHTSEY: Admitted that Paragraph 90 accurately quotes portions of the Confidentiality Agreement. Denied that Paragraph 90 correctly describes the intent of the parties to the Confidentiality Agreement. Mr. Nebola and Mr. Lightsey deny the remaining allegations in Paragraph 90.**

91.     Pursuant to the Confidentiality Agreement, Nebola and Lightsey further agreed to refrain from soliciting KIOSK employees or inducing KIOSK employees to leave KIOSK.

**ANSWER BY COLE KEPRO AND RASMUSSEN: Cole Kepro and Mr. Rasmussen lack knowledge or information regarding the intent of the parties to the contract and on that basis, deny such allegations. Cole Kepro and Mr. Rasmussen deny the remaining allegations in Paragraph 91.**

**ANSWER BY NEBOLA AND LIGHTSEY: Denied that Paragraph 90 correctly describes the intent of the parties to the Confidentiality Agreement. Mr. Nebola and Mr. Lightsey deny the remaining allegations in Paragraph 91.**

92.     Cole Kepro and American Kiosks was or should have been aware of Nebola and Lightsey's Confidentiality Agreement, and their obligations thereunder.

**ANSWER BY COLE KEPRO: Admitted that Cole Kepro became aware of the Confidentiality Agreement in the course of its hiring of Mr. Nebola. Cole Kepro denies that it was aware of the identities of KIOSK's customers or vendors. Cole Kepro denies that there is any industry meaning to the term "business relations," as that term is used in the Confidentiality Agreement. Cole Kepro denies the remaining allegations in Paragraph 92.**

**ANSWER BY NEBOLA: Admitted that Cole Kepro became aware of the Confidentiality Agreement in the course of its hiring of Mr. Nebola. Mr. Nebola denies that he possessed a comprehensive understanding of KIOSK's customers or vendors. Mr. Nebola denies that there is any industry meaning to the term**

"business relations," as that term is used in the Confidentiality Agreements. Mr. Nebola denies the remaining allegations in Paragraph 92.

**ANSWER BY LIGHTSEY AND RASMUSSEN: The Employee Defendants lack knowledge or information about the knowledge of Cole Kepro prior to their employment with the company and on that basis, deny the allegations in Paragraph 92. Messrs. Lightsey and Rasmussen deny that they possessed a comprehensive understanding of KIOSK's customers or vendors. Messrs. Lightsey and Rasmussen deny that there is any industry meaning to the term "business relations," as that term is used in the Confidentiality Agreements.**

93.    Cole Kepro and American Kiosks intentionally and improperly induced and/or otherwise caused Nebola and Lightsey not to perform, and to breach, their obligations under their respective Confidentiality Agreements.

**ANSWER: Denied.**

94.    As a direct and proximate result of Cole Kepro and American Kiosks' intentional interference with the Confidentiality Agreements, and Nebola and Lightsey's performance thereunder, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**ANSWER: Denied.**

**FOURTH CLAIM FOR RELIEF**
**Tortious Interference with Prospective Business Advantage**
**(Against Nebola, Lightsey, Cole Kepro, and American Kiosks)**

95.    KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: Defendants incorporate the foregoing paragraphs of this Answer as if fully set forth herein.**

96.     Through Nebola and Lightsey's employment with KIOSK, Nebola, Lightsey, Cole Kepro, and American Kiosks were aware of BOA's intent to purchase 1000 kiosk units from KIOSK.

**ANSWER BY COLE KEPRO: Admitted that Cole Kepro became aware that KIOSK had discussed a possible sale of 1000 kiosk units to BOA after Mr. Nebola and Mr. Lightsey left KIOSK. Denied that BOA "intended" to complete the purchase or that the purchase was ever finalized at the time of Mr. Nebola and Mr. Lightsey's departure. Cole Kepro denies the remaining allegations in Paragraph 96.**

**ANSWER BY NEBOLA AND LIGHTSEY: This claim has been dismissed against Mr. Nebola and Mr. Lightsey. *See* ECF No. 56. Admitted that Mr. Nebola and Mr. Lightsey were aware that KIOSK had discussed a possible sale of 1000 kiosk units to BOA.  Denied that BOA "intended" to complete the purchase or that the purchase was ever finalized at the time of Mr. Nebola and Mr. Lightsey's departure. Mr. Nebola and Mr. Lightsey deny the remaining allegations in Paragraph 96**

**ANSWER BY RASMUSSEN: Mr. Rasmussen lacks knowledge or information about the allegations in Paragraph 96, and on that basis, denies them.**

97.     Nebola, Lightsey, Cole Kepro, and American Kiosks engaged in improper conduct with the intention to induce or cause BOA not to finalize its purchase of 1000 kiosk units from KIOSK, and not to continue its business relations with KIOSK, including

by informing Samantha Miller that Nebola and Lightsey were leaving KIOSK and advising that BOA should refrain from placing its order of 1000 kiosk units with KIOSK.

**ANSWER: This claim has been dismissed against Mr. Nebola and Mr. Lightsey.** *See* **ECF No. 56. Denied.**

98.     Nebola, Lightsey, Cole Kepro, and American Kiosks actually induced or caused BOA not to enter into or continue its business relations with KIOSK. Specifically, due to Nebola, Lightsey, Cole Kepro, and American Kiosks' intentional interference, BOA refrained from placing its order of 1000 kiosk units with KIOSK, as it originally proposed and planned, and instead chose to dual source a pilot order between KIOSK and Cole Kepro/American Kiosks.

**ANSWER: This claim has been dismissed against Mr. Nebola and Mr. Lightsey.** *See* **ECF No. 56. Denied.**

99.     As a direct and proximate result of Nebola, Lightsey, Cole Kepro, and American Kiosks' intentional interference with KIOSK's business relations with BOA, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**ANSWER: This claim has been dismissed against Mr. Nebola and Mr. Lightsey.** *See* **ECF No. 56. Denied.**

**FIFTH CLAIM FOR RELIEF**
**Violation of the Defend Trade Secrets Act ("DTSA")**
**18 U.S.C. §1836, et seq.**
**(Against All Defendants)**

100.    KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: Defendants incorporate the foregoing paragraphs of this Answer as if fully set forth herein.**

101.   As set forth above, KIOSK owns various valid trade secrets within the meaning of the DTSA, 18 U.S.C. §1839(3), which are critical to the success of its business. Nebola, Lightsey, and Rasmussen had access to these trade secrets of KIOSK, including its engineering specifications for custom products, product configuration, confidential business and financial information, information concerning pricing and terms offered to its customers and prospective customers, and its negotiations with its customers and prospective customers, including BOA.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information regarding KIOSK's unspecified trade secrets or the Employee Defendants' access to information at KIOSK, and on that basis, denies those allegations. Cole Kepro denies that the list of information in Paragraph 101 is truly at issue in this dispute, and further that all of the items on that list, as relevant to this case, are trade secrets.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants lack knowledge or information about what KIOSK considers to be its trade secrets.  The Employee Defendants deny that the list of information in Paragraph 101 is truly at issue in this dispute, and further that all of the items on that list, as relevant to this case, are trade secrets. The Employee Defendants deny the remaining allegations in Paragraph 101.**

102.    The trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

**ANSWER: Defendants lack knowledge or information about the purported trade secrets alleged in Paragraph 102 and on that basis, deny such allegations. Defendants deny the remaining allegations in Paragraph 102.**

103.    KIOSK maintains these trade secrets on a secure system that is password-protected and restricted to authorized employees.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information regarding the allegations in Paragraph 103, and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that during the time of their employment, KIOSK required passwords for certain systems. The Employee Defendants deny all remaining allegations in Paragraph 103.**

104.    In addition to storing its trade secrets in password-protected, secure networks, KIOSK has also sought to protect its trade secrets by limiting its employees' use of the information through Confidentiality Agreements and policies.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information regarding the allegations in Paragraph 104, and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that during the time of their employment, KIOSK required passwords for certain systems. Admitted that KIOSK forced the Employee Defendants to sign the Confidentiality Agreements. The Employee Defendants lack knowledge or information about the remaining allegations in paragraph 104, and on that basis, deny them.**

105.   KIOSK's trade secrets are not readily ascertainable or generally known, thus the trade secrets give KIOSK an economic advantage over KIOSK's competitors.

**ANSWER: Defendants lack knowledge or information about the allegations in Paragraph 105, and on that basis, deny them.**

106.   The confidential trade secret information obtained by Defendants relates to KIOSK products and services used in interstate commerce.

**ANSWER: Denied.**

107.   On information and belief, Defendants have acquired KIOSK's trade secrets by improper means.

**ANSWER: Denied.**

108.   On information and belief, Nebola, Lightsey, and Rasmussen disclosed and/or used KIOSK's trade secrets without its consent, including by disclosing and/or using KIOSK's trade secrets for the benefit of Cole Kepro and American Kiosks.

**ANSWER: Denied.**

109.   Nebola, Lightsey, Rasmussen, Cole Kepro, and American Kiosks knew, or should have known, that the trade secrets were acquired through improper means, including because Nebola, Lightsey, and Rasmussen shared information with Cole Kepro and American Kiosks in violation of their Confidentiality Agreements with KIOSK.

**ANSWER: Denied.**

110.   The Defendants' actions as described herein constitute a misappropriation within the meaning of DTSA, 18 U.S.C. §1839(5).

**ANSWER: Denied.**

111. On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit KIOSK's trade secrets.

**ANSWER: Denied.**

112. As a direct and proximate result of Nebola, Lightsey, Rasmussen, and Cole Kepro, and American Kiosks' misappropriation of KIOSK's trade secrets, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**ANSWER: Denied.**

113. Because KIOSK's remedies at law are inadequate, KIOSK seeks injunctive relief. KIOSK is losing its competitive advantage and reputation, in an amount that may not be possible to determine. Thus, Defendants must be restrained from use and disclosures of Defendants' trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(A).

**ANSWER: Denied.**

**SIXTH CLAIM FOR RELIEF**
**Trade Secret Misappropriation Under Colorado Uniform Trade Secrets Act**
**C.R.S. §7-74-101 *et seq.***
**(Against All Defendants)**

114. KIOSK incorporates the foregoing paragraphs as if fully set forth herein. As set forth above, KIOSK owns various trade secrets within the meaning of "trade secrets" under Colorado law, which are critical to the success of its business. Nebola, Lightsey, and Rasmussen possessed valid trade secrets of KIOSK, including its engineering specifications for custom products, product configuration, confidential business and financial information, information concerning pricing and terms offered to its customers

and prospective customers, and its negotiations with its customers and prospective customers, including BOA.

**ANSWER BY COLE KEPRO: Cole Kepro incorporates the foregoing paragraphs of this Answer as if fully set forth herein. Cole Kepro lacks knowledge or information regarding KIOSK's unspecified trade secrets or the Employee Defendants' access to information at KIOSK, and on that basis, denies those allegations.**

**ANSWER BY EMPLOYEE DEFENDANTS: The Employee Defendants incorporate the foregoing paragraphs of this Answer as if fully set forth herein. The Employee defendants lack knowledge or information about what KIOSK considers to be its trade secrets.  The Employee Defendants deny that the list of information in Paragraph 114 is truly at issue in this dispute. The Employee Defendants deny the remaining allegations in Paragraph 114.**

115.    The trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

**ANSWER: Defendants lack knowledge or information about the purported trade secrets alleged in Paragraph 115 and on that basis, deny such allegations. Defendants deny the remaining allegations in Paragraph 115.**

116.    KIOSK maintains these trade secrets on a secure system that is password-protected and restricted to authorized employees.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information regarding the allegations in Paragraph 115, and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that during the time of their employment, KIOSK required passwords for certain systems. The Employee Defendants deny all remaining allegations in Paragraph 115.**

117. In addition to storing its trade secrets in password-protected, secure networks, KIOSK has also sought to protect its trade secrets by limiting its employees' use of the information through Confidentiality Agreements and policies.

**ANSWER BY COLE KEPRO: Cole Kepro lacks knowledge or information regarding the allegations in Paragraph 117, and on that basis, denies them.**

**ANSWER BY EMPLOYEE DEFENDANTS: Admitted that during the time of their employment, KIOSK required passwords for certain systems. Admitted that KIOSK forced the Employee Defendants to sign the Confidentiality Agreements. The Employee Defendants lack knowledge or information about the remaining allegations in paragraph 117, and on that basis, deny them.**

118. KIOSK's trade secrets are not readily ascertainable or generally known, thus the trade secrets give KIOSK an economic advantage over KIOSK's competitors.

**ANSWER: Defendants lack knowledge or information about the allegations in Paragraph 105, and on that basis, deny them.**

119. On information and belief, Defendants have acquired KIOSK's trade secrets by improper means.

**ANSWER: Denied.**

120.    On information and belief, Nebola, Lightsey, and Rasmussen disclosed and/or used KIOSK's trade secrets without its consent, including by disclosing and/or using KIOSK's trade secrets for the benefit of Cole Kepro and American Kiosks.

**ANSWER: Denied.**

121.    Nebola, Lightsey, Rasmussen, Cole Kepro, and American Kiosks knew, or should have known, that the trade secrets were acquired through improper means, including because Nebola, Lightsey, and Rasmussen shared information with Cole Kepro and American Kiosks in violation of their Confidentiality Agreements with KIOSK.

**ANSWER: Denied.**

122.    On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit KIOSK's trade secrets.

**ANSWER: Denied.**

123.    As a direct and proximate result of Nebola, Lightsey, Rasmussen, Cole Kepro, and American Kiosks' misappropriation of KIOSK's trade secrets, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**ANSWER: Denied.**

124.    Because KIOSK's remedies at law are inadequate, KIOSK seeks injunctive relief. KIOSK is losing its competitive advantage and reputation, in an amount that may not be possible to determine. Thus, Defendants must be restrained from use and disclosures of Defendants' trade secrets pursuant to C.R.S. § 7-74-103.

**ANSWER: Denied.**

**SEVENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against Nebola, Lightsey, Cole Kepro, and American Kiosks)**

125.   KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: Defendants incorporate the foregoing paragraphs of this Answer as if fully set forth herein.**

126.   Defendants, through their misconduct, have obtained access to KIOSK's confidential business and financial information, and access to KIOSK's customers and potential customers, including BOA, at KIOSK's expense.

**ANSWER: This claim has been dismissed against Mr. Nebola and Mr. Lightsey. *See* ECF No. 56. Denied.**

127.   Defendants are not entitled to KIOSK's confidential business and financial information, which they have acquired through misconduct. Defendants should not be rewarded for their intentional wrongdoing.

**ANSWER: This claim has been dismissed against Mr. Nebola and Mr. Lightsey. *See* ECF No. 56. Denied.**

128.   Nebola, Lightsey, Cole Kepro, and American Kiosks used KIOSK's confidential business and financial information, and its relationship with BOA, to misappropriate KIOSK's business opportunity with BOA including, specifically, BOA's prospective order for 1000 kiosk units.

**ANSWER: This claim has been dismissed against Mr. Nebola and Mr. Lightsey. *See* ECF No. 56. Denied.**

129.    Nebola, Lightsey, Cole Kepro, and American Kiosks thus received a benefit, at KIOSK's expense, including by receiving BOA orders and/or other business that they would not have otherwise received, and associated compensation.

**ANSWER: This claim has been dismissed against Mr. Nebola and Mr. Lightsey. *See* ECF No. 56. Denied.**

**EIGHTH CLAIM FOR RELIEF**
**Common Law Unfair Competition**
**(Against All Defendants)**

130.    KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: This claim has been dismissed. *See* ECF No. 56.**

131.    Defendants conspired to misappropriate KIOSK's trade secrets by using Nebola's position as KIOSK's Vice President of Sales, Lightsey's position as KIOSK's Director of Product Management, and Rasmussen's position as Prototype Systems Manager to gain access to KIOSK's confidential, proprietary, and trade secret information to divert KIOSK's customers and prospective customers to Cole Kepro and American Kiosks.

**ANSWER: This claim has been dismissed. *See* ECF No. 56. To the extent an answer is required, denied.**

132.    Defendants have used and are continuing to use KIOSK's confidential, proprietary, and trade secrets information for their own benefit to gain an unfair advantage by poaching KIOSK's clients and prospective clients.

**ANSWER: This claim has been dismissed. *See* ECF No. 56. To the extent an answer is required, denied.**

133.   For example, as previously mentioned, on information and belief Defendants used KIOSK's confidential, proprietary, and trade secret information to design for BOA a kiosk that was strikingly similar to that designed by KIOSK. Specifically, Defendants incorporated components sourced from the same suppliers and strategically placed these components in a nearly identical configuration as that of the KIOSK design.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

134.   Additionally, Defendants overtly copied entire sections of KIOSK's website for use in their own website.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

135.   In so doing, Defendants gain an unfair advantage in the design, manufacture, and marketing of similar kiosks.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

136.   As a direct and proximate result of Defendants' actions, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

**NINTH CLAIM FOR RELIEF**
**Breach of Duty of Loyalty**
**(Against Nebola, Lightsey, and Rasmussen)**

137.   KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56.**

138.   Nebola, Lightsey, and Rasmussen were obligated to maintain KIOSK's confidential, proprietary, and trade secret information.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

139.   As KIOSK executives and employees, Nebola, Lightsey, and Rasmussen owed KIOSK an undivided duty to act with the utmost good faith and candor and in KIOSK's best interest and to not compete with or divert business opportunities from KIOSK to its competition.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

140.   KIOSK was entitled to place its trust and confidence in Nebola, Lightsey, and Rasmussen and to expect that they act with the utmost good faith and candor toward KIOSK in carrying out their duties at KIOSK. As such, KIOSK authorized Nebola, Lightsey, and Rasmussen to access confidential, proprietary, and trade secret information to conduct business on KIOSK's behalf.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

141.   Nebola sent Lightsey contracts with KIOSK's client, CSG, and quotes for the transaction with BOA, for the benefit of Cole Kepro and American Kiosks. Nebola and Lightsey further acted against the best interests of KIOSK when they contacted BOA and instructed BOA to hold off placing an order for the kiosks with KIOSK because they were leaving KIOSK and joining a competitor.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

142.   Nebola, Lightsey, and Rasmussen owed KIOSK a duty of loyalty as KIOSK's employees.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

143.   Nebola, Lightsey, and Rasmussen breached their duty of loyalty to KIOSK by misappropriating KIOSK's confidential, proprietary, and trade secret information before resigning, and disclosing and/or using that information to benefit their new employer, Cole Kepro / American Kiosks.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

144.   KIOSK has been damaged by Nebola's, Lightsey's, and Rasmussen's actions and is entitled to the relief requested. As a direct and proximate result of Nebola, Lightsey, and Rasmussen's actions, KIOSK has suffered and continues to suffer substantial damages, including direct and reputational damages, in an amount to be proven at trial.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

**TENTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(Against Nebola and Lightsey)**

145. KIOSK incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56.**

146. Nebola and Lightsey were officers and/or directors of KIOSK and owed fiduciary duties to KIOSK.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

147. On information and belief, while employed by KIOSK, Nebola breached his fiduciary duties to KIOSK by agreeing to help Cole Kepro and American Kiosks poach KIOSK's employees.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

148. On information and belief, while employed by KIOSK, Nebola and Lightsey breached their fiduciary duties by using their insider knowledge of KIOSK's business, including proprietary information related to KIOSK's customers and prospective customers, to interfere with KIOSK's prospective business relationships.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

149.    As a result of these breaches, KIOSK has been damaged in an amount to be proven at trial.

**ANSWER: This claim has been dismissed.** *See* **ECF No. 56. To the extent an answer is required, denied.**

## PRAYER FOR RELIEF

Defendants deny that KIOSK is entitled to any of the relief sought in the Complaint's Prayer for Relief, and request that the Court enter judgment in their favor on all counts.

## AFFIRMATIVE DEFENSES

Without admitting any of the allegations in the Complaint and without admitting or suggesting that Defendants bear the burden of proof on any of the following issues or defenses, and subject to its right to assert additional defenses, Defendants assert the following defenses to the claims asserted in the Complaint. Nothing in this Answer is intended to waive, or should be construed as waiving, any defense that can be raised by Defendants to any of Plaintiff's claims in the future.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim or cause of action upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

KIOSK's claims for breach of contract and tortious interference with contract / business relations are  barred in whole or in part because the Executive Confidentiality Assignment Agreements are illegal, overbroad, contrary to public policy, contrary to

Colorado Law, and/or and purport to impose on the Employee Defendants undue restrictions on their livelihoods.

### THIRD AFFIRMATIVE DEFENSE

KIOSK's claims for breach of contract and tortious interference with contract / business relations are barred in whole or in part because the Executive Confidentiality Assignment Agreements are unconscionable.

### FOURTH AFFIRMATIVE DEFENSE

KIOSK's claims for breach of contract and tortious interference with contract / business relations are  barred in whole or in part because the Executive Confidentiality Assignment Agreements contain provisions that are impermissibly vague and/or contrary to the industry meaning or commonly understood meanings of the provisions in question.

### FIFTH AFFIRMATIVE DEFENSE

KIOSK's claims for breach of contract and tortious interference with contract / business relations are barred in whole or in part because the Defendants did not have specific knowledge of the customers or vendors whose relationships Defendants purportedly interfered with.

### SIXTH AFFIRMATIVE DEFENSE

KIOSK's tort claims are barred in whole or in part by the economic loss rule because a contract or contracts govern(s) the same purported obligations alleged in tort.

### SEVENTH AFFIRMATIVE DEFENSE

KIOSK's claims are barred in whole or in part because KIOSK's own conduct caused its loss of its prospective business relationship with Bitcoin of America.

### EIGHTH AFFIRMATIVE DEFENSE

KIOSK's claims are barred in whole or in part because it has failed to mitigate its damages in this case.

### NINTH AFFIRMATIVE DEFENSE

KIOSK's claims are barred in whole or in part because its allegations amount to an improper and undue restraint on trade.

### TENTH AFFIRMATIVE DEFENSE

KIOSK's claims are barred in whole or in part because the Defendants' conduct is protected by the business competition privilege.

### ELEVENTH AFFIRMATIVE DEFENSE

KIOSK's claims are barred in whole or in part because Cole Kepro's enrichment, if any, from the events in question was not unjust.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendants demand a jury trial on all issues so triable.

Dated: August 18, 2023

Respectfully submitted,

*/s/ Alec P. Harris*
Alec P. Harris
ARMSTRONG TEASDALE LLP
4643 S. Ulster Street, Suite 800
Denver, CO  80237
(720) 200-0676
aharris@atllp.com

Charles W. Steese
PAPETTI SAMUELS WEISS MCKIRGAN LLP
16430 N. Scottsdale Road, Ste. 290
Scottsdale, AZ 85254
480.800.3537
csteese@pswmlaw.com

*Attorneys for Defendants Cole Kepro*
*International, LLC, Eric Nebola, Taylor*
*Lightsey, and Michael Rasmussen*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served via ECF on August 18, 2023 to:

David J. Tsai
John Steger
Natalie Truong
PILLSBURY WINTHROP SHAW PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 983-1000
david.tsai@pillsburylaw.com
john.steger@pillsburylaw.com
natalie.truong@pillsburylaw.com

*Attorneys for Plaintiff KIOSK Information Systems, Inc.*

/s/ *Jana Shuster*